**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

JEFFREY BRADBY, KIMBERLY WEBB, RAYMOND DIGIORGIO, ASHLEY HICKS, RONALD SHORES, RACHAEL SIMPSON, MARTIN ROWLAND, SHELLEY THOMAS, ANGEL BARRAGAN, JUSTIN REAGAN, KEVIN SAVASKI, SANDRA RAY, DAVID ELAND, DIANA MATTHEWS, DAVID CIOTTI, BRAD SMITH, CHANNELLE HOWELL, ROBIN BROWN, MICHAEL WALLER, JAMES LAWSON, HUBERTA LEWIS, MELISSA MELSON, JAMIE DIPINO, and GWENDOLYN ROBINSON, *on behalf of themselves and all individuals similarly situated,*

Plaintiffs,

v.

Civil Action No. 3:25-cv-0026

DAN KOETTING; JAIRO PEREZ; GDA CONSULTING GROUP, LLC; BENCHMARK CONSULTING AND MANAGEMENT, LLC; ENVISION MANAGEMENT, LLC; KP INVESTMENT GROUP, LLC; MARK KOETTING; RUSSELL MYRICK; MRC CONSULTING, LLC; PG2, LLC; VIVUS SERVICING, LTD; AS 4FINANCE, LTD., MARK BETTIOL; MARY JO WALKER; DIWAKAR CHOUBEY; RICHARD CORREIA; MONEYLION TECHNOLOGIES INC.; SALT LAKE CAPITAL, LLC; HARROWGATE CAPITAL I LLC; JESUS DIAZ; OSCAR RODRIGUEZ; UNIFIED ANALYTICS, LLC; NATIONAL TECHMARK, INC., NIS; and JOHN DOES 1-20,

Defendants.

## CLASS ACTION COMPLAINT

Plaintiffs, *on behalf of themselves and all individuals similarly situated*, by counsel, and for their Complaint against Defendants, allege as follows:

## INTRODUCTION

1. All of the Plaintiffs were class members in a lawsuit styled *Fitzgerald v. Wildcat*, Case No. 3:20-cv-00044(NKM/JCH). In that case, five consumer borrowers sued the tribal officials of the Lac du Flambeau Band of Lake Superior Chippewa Indians, a federally recognized Native American tribe (the "Tribe" or "LDF"), as well as several of the LDF's non-tribal business partners who created, developed, aided, and abetted a usurious lending scheme that offered illegal loans with unconscionable interest rates often exceeding 700% APR.

2. The *Fitzgerald* litigation resulted in a nationwide class settlement requiring the repayment more than $37 million dollars, as well as the cancellation of more than $1.4 ***billion*** dollars of loans by the tribal lending entities. *See Fitzgerald v. Wildcat*, Case No. 3:20-cv-00044 (W.D. Va.), Dec. 17, 2024 Final Approval Order, ECF 201. And while that settlement involved several key participants in the scheme, other major participants were not identified until August 2024, and those participants were expressly excluded from the nationwide class settlement.

3. Like several other cases brought before this Court, this case arises from a tribal lending scheme—"the most recent incarnation of payday lending companies regulation-avoidance." Nathalie Martin & Joshua Schwartz, *The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?*, 69 Wash. & Lee L. Rev. 751, 785 (2012). Under this model, non-tribal payday lenders and their business partners used Native American tribes to originate illegal loans to facilitate a dubious and legally incorrect claim that the loans were subject to tribal law and tribal sovereign immunity, not the protections created by state usury and licensing laws. But as the Fourth Circuit held in the related litigation:

"substantive state law applies to off-reservation conduct," such as online loans marketed, collected, and paid by consumers in Virginia. *Hengle v. Treppa*, 19 F.4th 324, 348 (4th Cir. 2021), *affirming sub nom. Hengle v. Asner*, 433 F. Supp. 3d 825 (E.D. Va. 2020) (Novak, J.). And "although the Tribe itself cannot be sued for its commercial activities," its members, officers, and business partners "can be." *Id.*

4. Beginning in 2012 or 2013, the Tribe started participating in multiple partnerships with non-tribal payday lenders that wished to skirt state and federal lending laws. Around that time, Brent McFarland, the Tribe's then-director of business development, explained to the Milwaukee Journal Sentinel that "we're looking for ways to leverage (the tribe's) sovereignty" for profit. Ex. 1. Non-tribal payday lenders were motivated to provide the Tribe with a nominal percentage of their revenue in exchange for shrouding their illegal loans.

5. Through the *Fitzgerald* litigation, several additional business partners and investors—named as Defendants in this lawsuit—were discovered to have knowingly aided, funded, facilitated, and participated in the usurious lending scheme at issue in this case. As a result of this conduct, Plaintiffs allege that Defendants violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), which was expressly enacted "to seek the eradication of organized crime in the United States," including loan sharking. Pub. L. 91–452, § 1. Together with the defendants in *Fitzgerald* and others, Defendants knowingly participated in the operation of and conspired with other members of the enterprise to profit from the usurious loans.

6. Plaintiffs also assert class common law claims for unjust enrichment and civil conspiracy. In similar cases, this Court has repeatedly found that "any money paid on a void contract" constitutes "a benefit for the purposes of an unjust enrichment" claim. *Williams v. Big Picture Loans, LLC*, 339 F.R.D. 46, 63 (E.D. Va. 2021); *see also Gibbs v. Haynes Invs., LLC*, 368

F. Supp. 3d 901, 934 (E.D. Va. 2019) (finding plaintiffs stated a claim against a non-tribal entity who received 1% of the illegal loans); *Hengle v. Asner*, 433 F. Supp. 3d 825, 896 (E.D. Va. 2020) (same). This Court has also found civil conspiracy can apply to participants, such as the individual defendants, who facilitate the scheme. Accordingly, under these common law theories, Plaintiffs seek to recover all amounts paid on their and other class members' loans, as well as their costs and attorneys' fees.

## JURISDICTION

7. This Court has subject matter jurisdiction pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1332(d)(2). Moreover, the Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

8. This Court has personal jurisdiction over Defendants because RICO authorizes nationwide service of process. As a result, personal jurisdiction over a defendant may be exercised anywhere in the United States so long as it does not violate the Fifth Amendment. *ESAB Grp., Inc. v. Centricut, Inc.*, 126 F.3d 617 (4th Cir. 1997). Because Defendants are all residents of the United States, the Court has personal jurisdiction over them under the Fifth Amendment.

9. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiffs' claims occurred in Virginia, including in this District and Division, where Plaintiff Bradby resides. The lending entities identified in this Complaint conduct business solely through their respective websites. The entities each deploy uniform algorithms and coding on these websites that take information input by a prospective borrower and nearly-instantaneously determines whether and on what terms to issue a loan to the borrower, generating a loan contract based on those automated decisions. During the relevant period, the server hosting the websites for three of these entities—Bridge Lending, Evergreen Services, and

Radiant Cash—is or has been located in Ashburn, Virginia. Thus, the loan applications submitted by Plaintiffs and the putative class members to these entities, which form part of the Usurious Lending Enterprise identified in this Complaint in which all Defendants participated, were each submitted and processed through Virginia-based servers located in this District.

10. Venue is also proper in this Court pursuant to 28 U.S.C. § 1965(a) because Defendants transacted their affairs in Virginia through their participation in a conspiracy and a lending enterprise targeting Virginia consumers. In the alternative, venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(3) because Defendants are residents of different states and there is no single district where this action could otherwise be brought.

## PARTIES

11. Plaintiff James Bradby is a natural person and resident of this Division.

12. Plaintiff Kimberly Webb is a natural person and resident of North Carolina.

13. Plaintiff Raymond DiGiorgio is a natural person and resident of Florida.

14. Plaintiff Ashley Hicks is a natural person and resident of California.

15. Plaintiff Ronald Shores is a natural person and resident of California.

16. Plaintiff Rachael Simpson is a natural person and resident of California.

17. Plaintiff Martin Rowland is a natural person and resident of California.

18. Plaintiff Shelley Thomas is a natural person and resident of Michigan.

19. Plaintiff Angel Barragan is a natural person and resident of California.

20. Plaintiff Justin Reagan is a natural person and resident of Florida.

21. Plaintiff Kevin Savaski is a natural person and resident of Mississippi.

22. Plaintiff Sandra Ray is a natural person and resident of Michigan.

23. Plaintiff David Eland is a natural person and resident of Michigan.

24. Plaintiff Diana Matthews is a natural person and resident of Texas.

25. Plaintiff David Ciotti is a natural person and resident of Maryland.

26. Plaintiff Brad Smith is a natural person and resident of Missouri.

27. Plaintiff Channelle Howell is a natural person and resident of Missouri.

28. Plaintiff Robin Brown is a natural person and resident of California.

29. Plaintiff Michael Waller is a natural person and resident of Pennsylvania.

30. Plaintiff James Lawson is a natural person and resident of Florida.

31. Plaintiff Huberta Lewis is a natural person and resident of Arizona.

32. Plaintiff Melissa Melson is a natural person and resident of Michigan.

33. Plaintiff Jamie Dipino is a natural person and resident of Washington.

34. Plaintiff Gwendolyn Robinson is a natural person and resident of Illinois.

35. Defendant Dan Koetting is a natural person and resident of San Diego, California. Dan Koetting is the co-founder and manager of GDA Consulting Group, LLC, which he co-founded to facilitate the making and collection of the usurious loans originated in the name of Biboon, LLC, d/b/a Bridge Lending Solutions ("Bridge Lending"). Dan Koetting is the co-founder and manager of Envision Management, LLC, which he created to facilitate the making and collection of the usurious loans originated in the name of Opichi, LLC d/b/a Evergreen Services ("Evergreen Services"). As detailed below, Dan Koetting personally participated in and oversaw the illegal lending enterprise alleged herein, rendering him personally liable.

36. Defendant Jairo Perez is a natural person and resident of San Diego, California. Along with Defendant Dan Koetting, Perez is a co-founder and manager of GDA Consulting Group, LLC, which he and Koetting created to facilitate the making and collection of the usurious loans originated in the name of Bridge Lending. Perez is also the co-founder and manager of

Envision Management, LLC, which he created to facilitate the making and collection of the usurious loans originated in the name of Evergreen Services. As detailed below, Mr. Perez personally participated in and oversaw the illegal lending enterprise alleged herein, rendering him personally liable.

37. Defendant GDA Consulting Group, LLC, is a limited liability formed under the laws of Delaware. As early as August 18, 2017, GDA Consulting entered into a "servicing agreement" with the LDF, which provided Defendants Dan Koetting, Jairo Perez, and GDA with the exclusive right to originate, renew, service, and collect loans made in the name of Bridge Lending. Among other things and typical of the tribal lending model, the servicing agreement provided GDA (and hence Defendants Koetting and Perez) with sole authority and responsibility for marketing, underwriting, servicing, electronic data storage, vendor selection and maintenance, loan administration, and collections. Because they ran the operations, Defendants GDA, Dan Koetting and Perez received virtually all of the profits from the usurious loans made in the name of Bridge Lending—except for a nominal flat-fee returned to the LDF for allowing it to serve as a front for the illegal lending activities.

38. Defendant Benchmark Consulting and Management, LLC ("BCM"), is a limited liability formed under the laws of Delaware. Upon information and belief, Defendant BCM is owned, managed, and operated by Defendants Dan Koetting and Jairo Perez. On May 1, 2023, BCM entered into a similar servicing agreement with Biboon, LLC, which provided Defendants Dan Koetting, Jairo Perez, and BCM with the continued right to originate, renew, service, and collect loans made in the name of Bridge Lending. Just like the previous agreement, the new arrangement provided BCM (and hence Defendants Koetting and Perez) with sole authority and responsibility for marketing, underwriting, servicing, electronic data storage, vendor selection and

maintenance, loan administration, and collections. Because they ran the operations, Defendants BCM, Dan Koetting and Perez continued to receive virtually all of the profits from the usurious loans made in the name of Bridge Lending.

39. Defendant Envision Management, LLC, is a limited liability formed under the laws of Delaware. Upon information and belief, Defendant Envision Management is owned, managed, and operated by Defendants Dan Koetting and Jairo Perez. As early as December 1, 2020, Envision Management entered into a “servicing agreement” with the LDF, which provided Defendants Dan Koetting, Jairo Perez, and Envision Management with the exclusive right to originate, renew, service, and collect loans made in the name of second portfolio entitled Evergreen Services. Among other things and typical of the tribal lending model, the servicing agreement provided Evergreen Services (and hence Defendants Koetting and Perez) with sole authority and responsibility for marketing, underwriting, servicing, electronic data storage, vendor selection and maintenance, loan administration, and collections. Because they ran the operations, Defendants Envision Management, Dan Koetting and Perez received virtually all of the profits from the usurious loans made in the name of Evergreen Services—except for a nominal flat-fee returned to the LDF for allowing it to serve as a front for the illegal lending activities.

40. Defendant KP Investment Group, LLC, is a limited liability formed under the laws of Delaware. Upon information and belief, Defendant KP Investment Group is owned, managed, and operated by Defendants Dan Koetting and Jairo Perez. As early as September 5, 2017, KP Investment entered into a loan agreement with Bridge Lending. The purpose of this loan was to provide the capital to implement, operate, and maintain the consumer loan portfolio originated in the name of Bridge Lending. Upon information and belief, and typical of other “loan agreements” used to facilitate the tribal business model, the loan agreement provided KP Investment Group

(and, hence, Koetting and Perez) with: (1) access to the books and records for Bridge Lending; (2) deposit control agreements; (3) prioritized disbursements; (4) granting of a security interest in the loans; (5) restrictions on the use of the proceeds; (6) servicing requirements for the collection of the loans, including the use of certain third parties; (7) prohibitions on the change of business policies; (8) rights to assume the business in the event of default on the repayment of the capital; and (9) waivers of sovereign immunity for the Tribe and its entities.

41. Defendant Mark Koetting is a natural person and resident of San Diego, California. Mark Koetting is the co-founder and manager of MRC Consulting, LLC, which he co-founded to facilitate the making and collection of the usurious loans originated in the name of Anong, LLC d/b/a Avail Blue ("Avail Blue"). As detailed below, Mark Koetting personally participated in and oversaw the illegal lending enterprise, rendering him personally liable.

42. Defendant Russell Myrick is a natural person. Along with Defendant Mark Koetting, Russell Myrick is a co-founder and manager of MRC Consulting, LLC, which was created to facilitate the making and collection of the usurious loans originated in the name of Avail Blue. As detailed below, Mr. Myrick personally participated in and oversaw the illegal lending enterprise, rendering him personally liable.

43. Defendant MRC Consulting, LLC ("MRC"), is a limited liability formed under the laws of Delaware. As early as August 18, 2017, MRC entered into a "servicing agreement" with the LDF, which provided Defendants Mark Koetting, Russell Myrick, and MRC with the exclusive right to originate, renew, service, and collect loans made in the name of Avail Blue. Among other things and typical of the tribal lending model, the servicing agreement provided MRC (and hence Defendants Koetting and Myrick) with sole authority and responsibility for marketing, underwriting, servicing, electronic data storage, vendor selection and maintenance, loan

administration, and collections. Because they ran the operations, Defendants MRC, Mark Koetting and Myrick received virtually all of the profits from the usurious loans made in the name of Avail Blue—except for a nominal flat-fee returned to the LDF for allowing it to serve as a front for the illegal lending activities.

44. Defendant PG2, LLC ("PG2) is a limited liability formed under the laws of Delaware. Upon information and belief, PG2 is owned, managed, and operated by Defendants Mark Koetting and Myrick. As early as September 6, 2017, PG2 entered into a loan agreement with Avail Blue. The purpose of this loan was to provide the capital to implement, operate, and maintain the consumer loan portfolio originated in the name of Avail Blue. Upon information and belief, and typical of other "loan agreements" used to facilitate the tribal business model, the loan agreement provided PG2 (and, hence, Mark Koetting and Myrick) with: (1) access to the books and records for Avail Blue; (2) deposit control agreements; (3) prioritized disbursements; (4) granting of a security interest in the loans; (5) restrictions on the use of the proceeds; (6) servicing requirements for the collection of the loans, including the use of certain third parties; (7) prohibitions on the change of business policies; (8) rights to assume the business in the event of default on the repayment of the capital; and (9) waivers of sovereign immunity for the Tribe and its entities.

45. Defendant Vivus Servicing, Ltd. ("Vivus) is a company formed under the laws of Canada. As early as August 5, 2023, Vivus entered into a "servicing agreement" with the LDF, which provided it with the exclusive right to originate, renew, service, and collect loans made in the name of Niiwin, LLC d/b/a Lendgreen ("Lendgreen"). Among other things and typical of the tribal lending model, the servicing agreement provided Vivus (and hence its owners and managers) with sole authority and responsibility for marketing, underwriting, servicing, electronic data

storage, vendor selection and maintenance, loan administration, and collections. Because they ran the operations, Defendant Vivus received virtually all of the profits from the usurious loans made in the name of Lendgreen—except for a nominal flat-fee returned to the LDF for allowing it to serve as a front for the illegal lending activities.

46. Defendant AS 4finance, Ltd. ("4finance") is a company formed under the laws of Canada. 4finance is the parent company of Vivus. According to a declaration from its manager, 4finance specializes in providing operational and administrative services to digital consumer lenders and loan servicing companies in North America. After Vivus entered into the servicing agreement with Lendgreen, Vivus assigned those rights to 4finance. Upon information and belief, the rights assigned to 4finance included authority and responsibility for marketing, underwriting, servicing, electronic data storage, vendor selection and maintenance, loan administration, and collections. Thus, although the servicing agreement was technically with Vivus, 4finance was the company that actually handled the day-to-day responsibilities of the Lendgreen portfolio.

47. Defendant Mark Bettiol is a natural person and resident of Canada. Bettiol is the former chief executive officer and managing director of 4finance. According to his profile on LinkedIn, Bettiol built 4finance from "start up to over 200 employees," and established "all key organization functions," including "marketing, sales, collections, software development, risk & analytics." Ex. 2. Bettiol's profile further boasts that he built "from 0 to loan volume over $100M in six years," as well as established "innovative business models" that "managed 3 brands in 44 States." *Id*. Upon information and belief, one of these brands was Lendgreen; and Bettiol personally signed the servicing agreement on behalf of Vivus for the establishment, implementation, and operation of Lendgreen.

48. Defendant Mary Jo Walker is a natural person and resident of Canada. Walker the former managing director of 4finance's operations in the United States. In this capacity, Mary Jo Walker personally participated in and directly oversaw the illegal lending through Lendgreen, including oversight of the marketing, underwriting, servicing, vendor selection and maintenance, loan administration, and collections. Upon information and belief, Mary Jo Walker was the primary point of contact between LDF and 4finance and frequently communicated with the LDF for the purposes of furthering the illegal lending through Lendgreen.

49. Defendant Jesus Diaz is a natural person and resident of Florida. Diaz is the founder and co-owner of Defendants Unified Analytics, LLC and National Techmark, Inc. Diaz personally participated in and directly oversaw the illegal lending through National Small Loan, including oversight of the marketing, underwriting, servicing, vendor selection and maintenance, loan administration, and collections. Upon information and belief, Diaz frequently communicated with the LDF for the purposes of furthering the illegal lending through National Small Loan.

50. Defendant Oscar Rodriguez is a natural person and resident of Florida. Together with Diaz, Rodriguez is the founder and co-owner of Defendants Unified Analytics, LLC and National Techmark, Inc. Rodriguez personally participated in and directly oversaw the illegal lending through National Small Loan, including oversight of the marketing, underwriting, servicing, vendor selection and maintenance, loan administration, and collections. Upon information and belief, Diaz frequently communicated with the LDF for the purposes of furthering the illegal lending through National Small Loan.

51. Defendant Unified Analytics, LLC is a Florida limited liability company based in Gainesville, Florida. As early as June 9, 2015, Unified Analytics entered into a "servicing agreement" with the LDF, which provided it with the exclusive right to originate, renew, service,

and collect loans made in the name of National Small Loan. Among other things and typical of the tribal lending model, the servicing agreement provided Unified Analytics (and hence its owners and managers, including Diaz and Rodriguez) with sole authority and responsibility for marketing, underwriting, servicing, electronic data storage, vendor selection and maintenance, loan administration, and collections. Because they ran the operations, Defendant Unified Analytics and its owners, managers, and investors received virtually all of the profits from the usurious loans made in the name of National Small Loan—except for a nominal flat-fee returned to the LDF for allowing it to serve as a front for the illegal lending activities.

52. Defendant National Techmark, Inc., NIS ("Techmark") is a Florida corporation based in Gainesville, Florida. As early as June 9, 2015, Techmark issued loans to National Small Dollar. The purpose of these loans was to provide the capital to implement, operate, and maintain the consumer loan portfolio originated in the name of National Small Dollar. Upon information and belief, and typical of other "loan agreements" used to facilitate the tribal business model, the loan agreement(s) underlying these loans provided Techmark (and, hence, Rodriguez and Diaz) with: (1) access to the books and records for National Small Dollar; (2) deposit control agreements; (3) prioritized disbursements; (4) granting of a security interest in the loans; (5) restrictions on the use of the proceeds; (6) servicing requirements for the collection of the loans, including the use of certain third parties; (7) prohibitions on the change of business policies; (8) rights to assume the business in the event of default on the repayment of the capital; and (9) waivers of sovereign immunity for the Tribe and its entities

53. Defendant Diwakar "Dee" Choubey is a natural person and resident of New York. Diwakar Choubey is the co-founder and manager of HarrowGate Capital I, LLC ("HarrowGate"), which he co-founded to facilitate the making and collection of the usurious loans originated in the

name of Ishwaaswi, LLC d/b/a Radiant Cash ("Radiant"). Choubey is also the co-founder and CEO of Defendant MoneyLion, a nationwide payday lender whose employees, at Choubey's direction, provide the operational and technical support for Radiant's lending operation, including designing and maintaining Radiant's website, providing customer servicing support for Radiant loans, and also providing funding for the loans themselves. As detailed below, Diwakar Choubey personally participated in and oversaw the illegal lending enterprise alleged herein, rendering him personally liable.

54. Defendant Richard Correia is a natural person and resident of New York. Richard Correia is the co-founder and manager of Defendant Salt Lake Capital, LLC, as well as the President, Chief Financial Officer and Treasurer of Defendant MoneyLion Technologies, Inc. Through his roles at Salt Lake Capital and MoneyLion, Correia has directed the issuing and servicing of loans by Radiant. As detailed below, Richard Correia personally participated in and oversaw the illegal lending enterprise alleged herein, rendering him personally liable

55. Defendant MoneyLion Technologies Inc. ("MoneyLion") is a Delaware corporation based in New York, which was co-founded by Choubey. Through its digital technology platform, including its website and mobile app, since at least 2013, MoneyLion has offered and brokered online installment loans, engaged in the servicing and collection of such loans, and provided other financial products and services to consumers, as described below. Upon information and belief and as detailed below, MoneyLion has directed and controlled the lending, servicing, and collections activities of Radiant, including providing capital for loan origination; marketing support; website registration, design, and technical support; operating a call center for Radiant; and transactional and payment services through its employees.

56. Defendant Salt Lake Capital, LLC ("Salt Lake Capital") is a Delaware limited liability company founded and managed by Correia and Choubey. Upon information and belief, Salt Lake Capital is a subsidiary of MoneyLion. As early as February 2017, Salt Lake Capital entered into a "servicing agreement" with the LDF, which provided it with the exclusive right to originate, renew, service, and collect loans made in the name of Radiant. Among other things and typical of the tribal lending model, the servicing agreement provided Salt Lake Capital (and hence its owners and managers, including Correia and Choubey) with sole authority and responsibility for marketing, underwriting, servicing, electronic data storage, vendor selection and maintenance, loan administration, and collections. Because they ran the operations, Defendant Salt Lake Capital and its owners, managers, and investors received virtually all of the profits from the usurious loans made in the name of Radiant—except for a nominal flat-fee returned to the LDF for allowing it to serve as a front for the illegal lending activities.

57. Defendant HarrowGate Capital I LLC ("HarrowGate") is a Delaware limited liability company founded and managed by Defendant Choubey. As early as October 2013, HarrowGate issued loans to Radiant. The purpose of these loans was to provide the capital to implement, operate, and maintain the consumer loan portfolio originated in the name of Radiant. Upon information and belief, and typical of other "loan agreements" used to facilitate the tribal business model, the loan agreement(s) underlying these loans provided HarrowGate (and, hence, Choubey) with: (1) access to the books and records for Radiant; (2) deposit control agreements; (3) prioritized disbursements; (4) granting of a security interest in the loans; (5) restrictions on the use of the proceeds; (6) servicing requirements for the collection of the loans, including the use of certain third parties; (7) prohibitions on the change of business policies; (8) rights to assume the

business in the event of default on the repayment of the capital; and (9) waivers of sovereign immunity for the Tribe and its entities.

58. The John Doe Defendants Nos. 1-20 are the as-yet unknown individuals and business organizations that designed, are operating, and have extracted most of the revenue from the Usurious Lending Enterprise alleged herein. Their identity, which has been hidden as a key part of the underlying scheme, will be easily established in this litigation.

## FACTUAL BACKGROUND

### A. State usury and licensing laws protect consumers from usurious loans.

59. "From times immemorial," state governments have sought to "protect desperately poor people from the consequences of their own desperation" through usury laws. *Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs.*, 974 F. Supp. 2d 353, 356 (S.D.N.Y. 2013).

60. Typically, state usury laws involve: (1) an interest rate cap; and/or (2) a licensing requirement for lenders. Almost every state in the country has enacted one or both of these requirements, including Virginia, North Carolina, Florida, California, Michigan, Mississippi, Texas, Maryland, Missouri, Washington, Pennsylvania, Arizona, and Illinois, *i.e.*, the home states of each of the Plaintiffs where they applied for, received, and repaid their loans.

#### i. Virginia

61. Virginia's "usury laws serve a beneficial public purpose and are to be liberally construed with a view to advance the remedy and suppress the mischief." *Radford v. Cmty. Mortg. & Inv. Corp.*, 226 Va. 596, 601 (1984). The Supreme Court of Virginia has repeatedly acknowledged that Virginia's "usury statutes represent a clarification of the public policy of the state that usury is not to be tolerated, and the court should therefore be chary in permitting this policy to be thwarted." *See, e.g.*, *id.* (quoting *Heubusch & Reynolds v. Boone*, 213 Va. 414 (1972)).

62. In accordance with this policy, Virginia's general usury statute—absent certain exceptions not applicable in this case—provides that "no contract shall be made for the payment of interest on a loan at a rate that exceeds 12 percent per year." Va. Code § 6.2-303(A).

63. In addition to the general usury laws embodied in Virginia's chapter entitled "Interest and Usury," Virginia's legislature has enacted the Consumer Finance Act ("CFA"), which is "part of a comprehensive statutory, financial, and regulatory structure dating back to at least 1918," when it was known as the Small Loan Act. *Commonwealth v. NC Fin. Sols. of Utah, LLC*, 100 Va. Cir. 232, at *5 (2018).

64. The legislature enacted this statute because "the conduct of such business has long been the cause of general complaint and of much hardship and injustice to borrowers, and there is no regulation or provision of law which has proved effective for the protection of borrowers and for the punishment of usurious money lenders." *Id.* (quoting 1918 Va. Acts, ch. 402.); *see also Sweat v. Commonwealth*, 152 Va. 1041, 1057 (1929) (explaining that legislature enacted the Act in response "money loan sharks and salary-buyers").

65. Unlike the general usury statutes, the CFA "requires all who engage in the business of making noncommercial personal loans in Virginia to be licensed, and therefore regulated and supervised by the [Secretary of the Commonwealth]." *NC Fin. Sols. of Utah, LLC*, 100 Va. Cir. 232, at *6 (citing Va. Code § 6.2-1501(A)).

66. "The Legislature intended such lenders be subject to distinct scrutiny, including examination of their affairs and records no less than once every three years." *Id.* (citing Va. Code § 6.2-1531).

67. Critically, "[n]o distinction is made in the statute between domestic or foreign-based lending entities," *id.*, such as tribal lenders.

68. If a person violates the interest rate cap, the CFA imposes severe consequences, including criminal liability and forfeiture of all principal, interest, and any charges related to the loan. Va. Code § 6.2-1540 (making it a class 2 misdemeanor for any person who violates or participates in the violation of Virginia's interest rate cap); Va. Code § 6.2-1541(A) (declaring such loans "void" and principal uncollectible).

**ii. North Carolina**

69. In North Carolina, the legal interest rate chargeable to consumers is 8%. N.C. Gen. Stat. § 24-1.

70. Where a written contract exists, for loans with a principal amount of less than $25,000, North Carolina's maximum interest rate permitted is the greater of (1) "the latest published noncompetitive rate for U.S. Treasury bills with a six-month maturity as of the fifteenth day of the month plus 6%" rounded to nearest half percent, or (2) 16%. N.C. Gen. Stat. § 24-1.1(c).

71. Charging consumers more than the maximum interest rate—regardless of whether the interest has been paid or not—results in a forfeiture of the entire interest. N.C. Gen. Stat. § 24-2. If the interest has been paid, the borrower may recover twice the amount of interest paid. *Id.*

72. North Carolina's Consumer Finance Act ("CFA") provides that for loans of $15,000 or less, a consumer lender may not charge interest greater than that permitted by Chapter 24 of the General Statutes without first obtaining a license from the North Carolina Commissioner. N.C. Gen. Stat. §§ 53-166(a), 53-168.

73. Unlicensed venders who issue loans exceeding the maximum interest rate are guilty of a Class 1 misdemeanor. N.C. Gen. Stat. § 53-166(c). Additionally, the entire loan becomes

void, and the party in violation "shall not collect, receive, or retain any principal or charges whatsoever with respect to the loan." *Id.* § 53-166(d).

74. Defendants were never licensed to make consumer loans in North Carolina.

**iii. Florida**

75. Similarly, Florida has enacted usury laws that prohibit lenders from making high interest loans.

76. The Florida legislature passed laws prohibiting usury as early as 1822, before Florida even became a state in 1845.[1] As the Florida Supreme Court noted, "The very purpose of statutes prohibiting usury is to bind the power of creditors over necessitous debtors and prevent them from extorting harsh and undue terms in the making of loans." *Chandler v. Kendrick*, 146 So. 551, 552 (Fla. 1933).

77. Pursuant to Florida Statute § 687.03, interest rates greater than 18% per annum on loans in the amount of $500,000 or less are usurious. Those who violate the usury provisions must forfeit "the entire interest so charged, or contracted to be charged" and double the amount of usurious interest paid. Fla. Stat. § 687.04.

78. Additionally, in Florida, lenders must be licensed by the Office of Financial Regulation, and loans of $25,000 or less with interest exceeding 18% per annum are void and unenforceable. Fla. Stat. § 516.02(1-2). Even with a license, a lender may not charge interest exceeding 30% on the first $3,000 of the principal amount, 24% on the part of the principal amount

[1] *See* Jeremiah W. Blydenburgh, *A Treatise On The Law Of Usury; To Which Are Added, The Statutes Of Several States Relating To Interest Now In Force*, 172 (1844), *available at* https://books.google.com/books?id=6Fk9AAAAIAAJ&printsec=frontcover&source=gbs_ge_summary_r&cad=0#v=onepage&q&f=false.

exceeding $3,000 and up to $4,000, and 18% on that part of the principal amount exceeding $4,000 and up to $25,000. Fla. Stat. § 516.031(1). Neither the Defendants nor the LDF Lending Entities have obtained licenses to make loans in Florida.

79. If a lender (licensed or unlicensed) charges interest greater than legally permitted, the loan is void and unenforceable. Fla. Stat. § 516.02(2)(c).

80. Further, under Florida law, it is a criminal offense to make usurious loans at rates of 25% of higher. Fla. Stat. § 687.071. Loan contracts in excess of the 25% threshold triggering criminal liability for usury are similarly "void as against the public policy of the state as established by its Legislature." *Richter Jewelry Co. v. Schweinert*, 169 So. 750, 758–59 (Fla. 1935).

81. The Florida Attorney General has made clear that payday loans and similar loans are subject to Florida's usury laws. Fla. AGO 2000-26 (Fla. A.G.), 2000 WL 543211.

**iv. California**

82. Recognizing that "[u]sury—the charging of excessive interest rates—is an ancient concept dating back to the earliest commercial civilizations," California, which was founded in 1850, has regulated maximum interest rates since 1872. Robert R. Rickett, *California's Model Approach to Usury*, 18 Stan. L. Rev. 1381 (1966).

83. Currently, the law of usury in California is based upon California Constitution article XV, section 1, which limits the interest payable "[f]or any loan or forbearance of any money." *Sw. Concrete Products v. Gosh Constr. Corp.*, 798 P.2d 1247, 1249 (Cal. 1990) (quoting Cal. Const. Art. XV § 1).

84. Under the California Constitution, "unless a lender falls into one of the exemptions approved by the state legislature, it may not charge more than 10% interest per annum on a loan."

*Dev. Acquisition Group, LLC v. EA Consulting, Inc.*, 776 F. Supp. 2d 1161, 1164 (E.D. Cal. 2011) (citing Cal. Const. Art. XV § 1).

85. "California state law currently limits the amount collected on a loan to "twelve dollars upon one hundred dollars for one year," or 12 percent. Cal. Civ. Code § 1916-2. "Any agreement or contract of any nature in conflict with [the interest rate cap] shall be null and void as to any agreement or stipulation therein contained to pay interest and no action at law to recover interest in any sum shall be maintained and the debt can not be declared due until the full period of time it was contracted for has elapsed." *Id.*

86. Thus, "[a]n interest rate in excess of [12%] is usurious, and if a lender negotiates a loan at a usurious rate absent a qualified exemption, the agreement shall be void and the lender will have no action at law to recover any interest." *Dev. Acquisition Grp.*, 776 F. Supp. 2d at 1164 (citing Cal. Civ. Code § 1916-2).

87. California law further provides that any person who pays any amount exceeding the interest-rate cap may recover "treble the amount of the money so paid or value delivered in violation of said [cap]." Cal. Civ. Code § 1916-3(a).

88. California has also deemed the willful lending of usurious loans without a license a felony "punishable by imprisonment in the state prison for not more than five years or in the county jail for not more than one year." Cal. Civ. Code § 1916-3(b).

89. In addition to abiding by California's usury cap, lenders issuing loans to California residents are also required to obtain a license under the California Financing Law. *See* Cal. Fin. Code §§ 22000*, et seq.*

90. Even if licensed, moreover, a licensee is still limited in the interest rates it can charge based on the unpaid principal balance remaining. *See* Cal. Fin. Code § 22303 (setting, for

example, a "two and one-half percent per month" rate maximum on "that part of the unpaid principal balance . . . up to, including, but not in excess of [$225]," while limiting the rate for the portion between $225 and $900 to 2 percent, and the rate for $900-$1,650 to 1.5 percent).

91. Loans willfully issued by even unlicensed lenders in violation of these requirements are deemed "void" and "no person has any right to collect or receive any principal, charges, or recompense in connection with the transaction." Cal. Fin. Code § 22750.

92. Those who willfully violate the licensing requirements are also subject to fines and imprisonment. Cal. Fin. Code §§ 22753, 22780.

93. California's usury laws "are primarily designed to penalize those who take advantage of 'unwary and necessitous borrowers.'" *Dev. Acquisition Grp.*, 776 F. Supp. 2d at 1166 (quoting *Fox v. Peck Iron & Metal Co.*, 25 B.R. 674, 692-93 (Bankr. S.D. Cal. 1982)).

94. Lending at usurious interest rates also constitutes a violation of California's unfair competition laws, Cal. Bus. & Prof. Code § 17200, *et seq*., which prohibits unlawful, unfair, or deceptive business practices. Cal. Bus. & Prof. Code § 17200.

**v. Michigan**

95. When read together, Michigan's "pertinent statutes and caselaw provide a 'definite indication' that the public policy behind Michigan's usury statutes is to protect borrowers from excessive interest rates imposed by lenders." *Soaring Pine Cap. Real Est. & Debt Fund II, LLC v. Park St. Grp. Realty Servs., LLC*, 511 Mich. 89, 102 (2023).

96. "Consistently with this history, Michigan, since statehood, has enacted statutes imposing a fixed cap on the interest rate lenders may charge on certain loans while providing borrowers a mechanism for enforcing this limitation." *Id*. at 105.

97. Although there are certain exceptions not applicable here, "the generally applicable civil usury rate has consistently hovered around the level set by the 1838 statute," which is 5%, or 7% if stipulated in writing. *Id*. (citing MCL 438.31).

98. Moreover, Michigan criminalizes usury on any loan at a rate exceeding 25%. Mich. Comp. Laws Ann. § 438.41.

**vi. Mississippi**

99. "A contract for usurious interest is a corrupt contract, and is violative of the public policy of" Mississippi. *Kennedy v. Porter*, 170 So. 286, 288 (Miss. 1936).

100. Because the "public policy of the State condemns usury," Mississippi's "statute provides for the forfeiture of principal and interest if a rate in excess of 20% is contracted for or received." *Richardson v. Cortner*, 232 Miss. 885, 891 (1958).

**vii. Maryland**

101. Maryland law, Md. Code, Com. Law § 12-306, prohibits lenders from making consumer loans to Maryland residents in excess of 24% or 33% depending on the size of the loan.

102. Moreover, no person may make a loan under Maryland's Consumer Loan Law without being licensed by the Maryland Commissioner of Financial Regulation. Md. Code, Com. Law § 12-302; Md. Code, Fin. Inst. § 11-204. Md. Code, Com. Law § 12-314 provides that a person "who is neither a licensee nor exempt from licensing may not receive or retain any principal, interest, or other compensation with respect to any loan that is unenforceable under this subsection." Neither the Defendants nor the LDF Lending Entities have obtained licenses to make loans in Maryland.

103. Because Defendants violated Maryland's licensing and interest rate requirements, it was unlawful for any person, including Defendants, to collect or receive any interest, fees, or charges on the loans. Md. Code, Com. Law § 12-314.

104. For willful violations, like those committed here, Maryland law allows consumers to recover principal, interest, or other compensation paid to Defendants with respect to all loans. Md. Code, Com. Law § 12-313.

**viii. Missouri**

105. It is "generally accepted in" Missouri that "usury laws form a part of the public policy of the state." *Julian v. Burrus*, 600 S.W.2d 133, 140 (Mo. Ct. App. 1980).

106. In Missouri, the maximum allowable interest rate is ten percent per annum. Mo. Ann. Stat. § 408.030(1) ("Parties may agree, in writing, to a rate of interest not exceeding ten percent per annum on money due or to become due upon any contract, including a contract for commitment[.]").

107. "If a rate of interest greater than" 10% is paid, the person paying the same "may recover twice the amount of interest thus paid[.]" *Id.* at § 408.030(1)

**ix. Washington**

108. Washington's usury laws were "enacted in order to protect the residents of this state from debts bearing burdensome interest rates" and "in recognition of the duty to protect our citizens from oppression." RCW 19.52.005.

109. In Washington, the maximum allowable interest rate is twelve percent per annum. RCW 19.52.020(1); *see also* RCW 19.52.025; State Maximum Interest Rate, *available at* http://leg.wa.gov/CodeReviser/Documents/rates.htm. "No person shall directly or indirectly take

or receive in money, goods, or things in action, or in any other way, any greater interest for the loan or forbearance of any money, goods, or things in action." RCW 19.52.020(1).

110. If interest greater than the statutory maximum of twelve percent is directly or indirectly contracted for, received, or reserved, the contract is usurious. RCW 19.52.030.

111. If a usurious interest rate is charged, the creditor shall be entitled to collect only the principal amount of the loan, less the amount of interest accruing thereon, and if any interest was actually paid, the creditor shall be entitled to collect only the principal amount less twice the amount of the interest paid and less the amount of all accrued by unpaid interest. RCW 19.52.030. A plaintiff may seek application of these statutory penalties by bringing an action under RCW 19.52.032.

112. RCW Chapter 19.52 applies to loans made to any person residing in Washington at the time the loan was made, regardless of the location where the loan was made. RCW 19.52.034.

113. In addition to a statutory usury claim entitling a plaintiff to recover the penalties provided in RCW 19.52.030, entering into or transacting a usurious contract constitutes a per se unfair act or practice in the conduct of commerce for purposes of establishing a claim under the Washington Consumer Protection Act. RCW 19.52.036.

**x. Pennsylvania**

114. Pennsylvania has a clearly delineated public policy against usurious. *See Olwine v. Torrens*, 236 Pa.Super. 51, 56, 344 A.2d 665 (1975) ("[t]he statute against usury forms a part of the public policy of [Pennsylvania] and cannot be evaded by any circumvention or waived by the debtor"); *Pennsylvania Dep't of Banking v. NCAS of Delaware, LLC*, 596 Pa. 638, 649 (2008) ("It is well established that Commonwealth public policy prohibits usurious lending, a prohibition that has been recognized for well over 100 years.").

115. Consistent with this public policy, Pennsylvania caps interest rates at 6% for unlicensed lenders. 41 Pa. Stat. Ann. § 201 ("the maximum lawful rate of interest for the loan or use of money in an amount of fifty thousand dollars ($50,000) or less in all cases where no express contract shall have been made for a less rate shall be six per cent per annum.")

116. Despite Pennsylvania's clearly delineated public policy and interest rate cap, Defendants knowingly made loans with triple digit interest rates to Pennsylvanians like Plaintiff Michael Waller.

**xi. Arizona**

117. Arizona limits the interest rate on "any loan, indebtedness or obligation other than medical debt . . . [to] ten percent a year." Ariz. Rev. Stat. Ann. § 44-1201(A)(2).

118. Lenders who issue loans exceeding this amount must forfeit all interest, and borrowers are entitled to judgment for all amounts paid in excess of the usurious rate. *Id.* §§ 44-1203, 1204.

**xii. Texas**

119. Texas limits the "maximum rate or amount of interest" on a loan to "10 percent a year except as otherwise provided by law." Tex. Fin. Code § 302.001(b).

120. Lenders who issue loans exceeding the legal rate must "refund the amount of the excess to the borrower" or otherwise credit it against the lawful amounts owed. *Id.* § 302.101.

121. Failure to refund or credit the usurious amount on a consumer loan renders the lender liable to the borrower for "the greater of: (1) three times the amount computed by subtracting the amount of interest allowed by law from the total amount of interest contracted for, charged, or received; or (2) $2,000 or 20 percent of the amount of principal, whichever is less." *Id.* § 305.001(a); *see also id.* § 305.003.

122. And if the interest charged and received by the lender on a consumer loan is more than twice the legal rate, the lender is liable for "the principal amount on which the interest is charged and received" and "the interest and all other amounts charged and received." *Id.* § 305.002.

123. Texas law also makes the lender liable for the borrower's attorney's fees. *Id.* § 305.005.

**xiii. Illinois**

124. Illinois has passed an act directed at predatory lending such as those issued to Plaintiffs here. *See* 815 Ill. Comp. Stat. §§ 123/15-1-1, *et seq.* (Illinois Predatory Loan Prevention Act).

125. Under the Predatory Loan Prevention Act, a lender may not "contract for or receive charges exceeding a 36% annual percentage rate on the unpaid balance of the amount financed for a loan." *Id.* § 123/15-5-5. Loans with rates exceeding this cap are "null and void and no person or entity shall have any right to collect, attempt to collect, receive, or retain any principal, fee, interest, or charges related to the loan." *Id.* § 123/15-5-10.

126. The Act further prohibits persons and entities from evading its requirements by "purport[ing] to act as an agent, service provider, or in another capacity for another entity that is exempt from this Act," including by "hold[ing], acquir[ing], or maintain[ing], directly or indirectly, the predominant economic interest in the loan," or when "the totality of the circumstances indicate that the person or entity is the lender and the transaction is structured to evade the requirements of this Act," such as when the "person or entity . . . predominantly designs, controls, or operates the loan program." *Id.* § 123/15-5-15(b).

127. A violation of the Predatory Loan Prevention Act is considered a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, which entitles the borrower to actual and punitive damages. *Id.* § 123/15-10-5(b); 815 Ill. Compl. Stat. § 505/10a.

128. Illinois has also enacted a comprehensive statute to regulate the issuance of payday loans, which are loans with a term of less than 120 days. *See* 815 Ill. Comp. Stat. §§ 122/1-1, *et seq.* (Illinois Payday Loan Reform Act).

129. In relevant part, the Act prohibits a lender of payday loans from "contract[ing] for or receiv[ing] a charge exceeding a 36% annual percentage rate on the unpaid balance of the amount financed for a payday loan." *Id.* § 122/2-5(e-5).

130. The Act also requires lenders of payday loans to obtain a license. *Id.* § 122/3-3.

131. Loans issued by a lender without a license are deemed "null and void and the lender who made the loan shall have no right to collect, receive, or retain any principal interest or charges related to the loan." *Id.* § 122/4-10(h).

132. Material violations of the Act are also considered violations of the Illinois Consumer Fraud and Deceptive Business Practices Act and entitle the borrower to the remedies provided in that statute. *Id.* § 122/4-10(b).

**B. Overview regarding the creation of the tribal lending business model.**

133. Many states have enacted usury laws because "[u]sury legislation to cap interest rates on loans predates the founding of our country." *Payday Today*, 903 N.E.2d at 1060 (citing Peterson, *supra*, at 1116 n.13).

134. Unfortunately, despite the multitude of state and federal protections to prevent usurious lending, predatory financial services "are heavily marketed to financially vulnerable

consumers."[2] The collection of unlawful and usurious debt continues to be a major problem, in part because the profits to be realized by small, high interest loans are so high that illegal lenders are willing to take the significant risk of litigation and liability for their violations of state and federal law.

135. Over the past decade, payday lending has become "one of the fastest growing segments of the consumer credit industry," and as of 2005 "there were more payday-loan stores in the United States than McDonald's, Burger King, Sears, J.C. Penney, and Target stores combined." Martin & Schwartz, *supra* at 759 (quoting Karen E. Francis, Note, *Rollover, Rollover: A Behavioral Law and Economics Analysis of the Payday Loan Industry*, 88 Tex. L. Rev. 611, 611–12 (2010)).

136. It is no secret that "internet payday lenders have a weak history of complying with state laws." Martin & Schwartz, *supra* at 759.

137. Prior to the rent-a-tribe business model, some payday lenders entered into partnerships with national banks to avoid compliance with state laws.[3] Others, attempted to evade laws through claims that the loans were subject to the laws of a foreign country or state without any usury laws.

---

[2] *See* CFPB, *CFPB Finalizes Rule To Stop Payday Debt Traps* (Oct. 5, 2017), https://www.consumerfinance.gov/about-us/newsroom/cfpb-finalizes-rule-stop-payday-debt-traps/. Predatory financial services, including high-cost installment loans and payday debt traps, often involve "high-cost, small dollar loans to low income, low-credit borrowers" and "a repayment system that involves the lender withdrawing funds directly from the borrower's bank account." *Payday, Vehicle Title, and Certain High-Cost Installment Loans*, 131 Harv. L. Rev. 1852, 1852 (2018).

[3] *See, e.g.*, Jean Ann Fox & Edmund Mlerzwinkski, *Consumer Fed'n of Am. & U.S. Pub. Interest Research Grp.*, *Rent-a-Bank Payday Lending: How Banks Help Payday Lenders Evade State Consumer Protection* 17–22 (2001), *available at* http://www.consumerfed.org/pdfs/paydayreport.pdf.

138. In response to the crackdown on these arrangements, several payday lenders reincarnated the lending model through associations with Native American tribes to avoid state laws. Martin & Schwartz, *supra* at 759.

139. For example, in January 2009, one of the legal pioneers of the tribal lending model, Claudia Callaway, was "recommending that her clients move to a 'tribal model'" and "that under federal Indian law the tribal lender could make these loans, and they could sell the loans to a non-tribal entity, and the loans could be collected upon at the contract rate, and the loans would not be subject to state regulation." *Consumer Fin. Prot. Bureau v. CashCall, Inc.*, 2016 WL 4820635, at *2 (C.D. Cal. Aug. 31, 2016).

140. Callaway also advised her clients that tribal lending "contemplated two structures," *i.e.*, arm of the tribe lending or tribal member lending. *Id.*

141. Under either structure, Callaway claimed "the loans would be made under the laws of the tribe and would not have to comply with licensing and usury laws in states where borrowers resided." *Id.*

142. Often, at the other side of the table, were the attorneys at Rosette, LLP, which holds itself out as "a leading majority Indian owned national law firm representing tribal governments and tribal entities." Rosette, *Our Firm*, https://www.rosettelaw.com/our-firm/ (last visited on March 13, 2022); *see also Hengle v. Asner*, 433 F. Supp. 3d 825, 840 (E.D. Va. 2020) (detailing the role of Rosette in the origin of the tribal lending businesses).

143. Rosette shared Callaway's erroneous legal opinion that loans made through tribal entities did not need to comply with state licensing and usury laws—even when the tribe received a nominal amount of the proceeds from the loans.

144. Upon information and belief, Rosette represented the Lac du Flambeau Band of Lake Superior Chippewa Indians, including in the creation and implementation of its lending activities.

145. Like the prior schemes, this tribal lending model is highly problematic for several reasons. Most notably, the loans are aggressively marketed, created, and collected in the state where the consumer resides and thus are subject to the consumer's state licensing and usury laws. *Hengle*, 19 F.4th at 348.

146. Over the past ten years, no less than a dozen courts have considered the enforceability of these loans, each holding that tribal choice-of-law clauses were unenforceable under comparable circumstances and that state law applied. *Id.*[4]

147. In addition, there have been multiple class actions and government enforcement actions that have cancelled billions of dollars of these usurious loans, as well as returned hundreds of millions of dollars to consumers who were victimized by illegal tribal lending enterprises. *Turner v. ZestFinance, Inc.*, No. 3:19-cv-293, Final Approval Order at Dkt. 114 (E.D. Va. July 9, 2020) (granting final approval of a class settlement providing $170 million in debt cancellation and a common fund of $18.5 million); *Gibbs v. Plain Green, LLC*, No. 3:17-cv-495, Final Approval Order at Dkt. 141 (E.D. Va. Dec. 13, 2019) (granting final approval of a class settlement

[4] *See also, e.g.*, *Consumer Fin. Prot. Bureau v. CashCall, Inc.*, 2016 WL 4820635, at *7 (C.D. Cal. Aug. 31, 2016) (holding that "the tribal choice of law provision is unenforceable" because it was "clear that the parties' choice was solely based on CashCall's desire to shield itself against state usury and licensing laws."); *W. Sky Fin., LLC v. State ex rel. Olens*, 793 S.E.2d 357, 366 (Ga. 2016), *reconsideration denied* (Dec. 8, 2016); *Inetianbor v. CashCall, Inc.*, 2015 WL 11438192, at *3 (S.D. Fla. Dec. 8, 2015); *State ex rel. Cooper v. W. Sky Fin.*, LLC, , 2015 WL 5091229, at *10 (N.C. Super. Aug. 27, 2015); *MacDonald v. CashCall, Inc*, No. CV 16-2781, 2017 WL 1536427, at *10 (D.N.J. Apr. 28, 2017), *aff'd*, 883 F.3d 220 (3d Cir. 2018); *Dillon v. BMO Harris Bank, N.A.*, 856 F.3d 330, 336 (4th Cir. 2017); *Hayes v. Delbert Servs. Corp.*, 811 F.3d 666, 675 (4th Cir. 2016); *Rideout v. CashCall, Inc.*, 2018 WL 1220565, at *8 (D. Nev. Mar. 8, 2018).

providing $380 million in debt cancellation and a common fund of $53 million); *Galloway v. Williams*, No. 3:19-cv-470, Final Approval Order at Dkt. 115 (E.D. Va. Dec. 18, 2020) (granting final approval of a class settlement providing $100 million in debt cancellation and a common fund of $8.7 million); *Gibbs v. TCV, V, LLP*, No. 3:19-cv-00789, Final Approval Order at Dkt. 95 (E.D. Va. Mar. 29, 2021) (granting final approval of a class settlement providing $383 million in debt cancellation and a common fund of $50 million); *Hengle v. Asner,* No. 3:19-cv-250, Final Approval Order at Dkt. 230 (E.D. Va. Oct. 25, 2022) (granting final approval of a class settlement providing $450 million in debt cancellation and a common fund of $39 million); *Blackburn v. A.C. Israel Enterprises*, Case No. 3:22-cv-146, Final Approval Order at Dkt. 228 (E.D. Va.) (granting final approval of a class settlement creating a common fund of $25.5 million); *Fitzgerald v. Wildcat*, Case No. 3:20-cv-00044 (W.D. Va.), Dec. 17, 2024 Final Approval Order, Dkt. 201 (granting final approval of class settlement providing $1.4 billion in debt cancellation and common fund of $37 million).

148. Two prominent perpetrators were also convicted and sentenced to prison for their roles in payday lending schemes.[5]

149. Despite all the litigation and enforcement efforts, Defendants knowingly aided, abetted, facilitated, and profited from the usurious lending scheme as detailed below.

---

[5] *See* The United States Attorney's Office, Southern District of New York, *Scott Tucker Sentenced To More Than 16 Years In Prison For Running $3.5 Billion Unlawful Internet Payday Lending For e* (Jan. 8, 2018), https://www.justice.gov/usao-sdny/pr/scott-tucker-sentenced-more-16-years-prison-running-35-billion-unlawful-internet-payday; The United States Attorney's Office, Eastern District of Pennsylvania, *Two Men Found Guilty of Racketeering Conspiracy in Payday Lending Case*, (Nov. 27, 2017), https://www.justice.gov/usao-edpa/pr/two-men-found-guilty-racketeering-conspiracy-payday-lending-case.

**C. The Basic Structure of the Tribal Lending Model.**

150. The tribal lending model revolves around a series of agreements through which the tribe contractually relinquishes the right to control its lending entity.

151. This is accomplished primarily through a document dubiously labeled a "servicing agreement."

152. By way of one example, the Rosette law firm negotiated the terms of the tribal lending arrangement between Matt Martorello and a tribal company formed by the Lac Vieux Desert Band of Chippewa Indians in Michigan (the "LVD").

153. Consistent with the tribal lending model, Rosette's client, Red Rock, received 2% of the net revenue from the loans in return for the use of its name. Ex. 3 at § 2.25.

154. By contrast, Martorello's company received the "revenue remaining" and reimbursement for all advances and expenses. *Id*. §§ 3.5.1.

155. Additionally, under the servicing agreement, one of Martorello's companies, SourcePoint, was contractually entitled to exercise almost exclusive control over Red Rock's operations.

156. Among other things, the servicing agreement provided SourcePoint with the exclusive "authority and responsibility over all communications and interaction whatsoever between" Red Rock and "each servicer provider, lender and other agents" involved in the business. *Id*. § 3.1.

157. The non-tribal company also had the contractual right to "sweep [Red Rock's] bank account amounts into [SourcePoint's] bank accounts" to receive its share of the proceeds. *Id.* § 3.5.1.

158. As explained in a sworn declaration from the Vice Chairwoman of the LVD: "[w]hen Tribal Council initially agreed to the deal with Martorello," they "understood that all aspects of the lending business would be handled by Martorello and that the Tribe would have no risk. It was understood that Martorello's company would handle everything, including underwriting, marketing, servicing, funding, and collection of the loans." Ex. 4 at ¶ 3.

159. This declaration further that "[a]fter the inception of the business, it was operated completely by Martorello until government regulators and litigation against competitors began. As these cases proceeded, efforts were made to create the appearance of the Tribe's involvement, but the Tribe had no substantive involvement." *Id.* ¶ 4.

160. By way of another example, the Rosette law firm also used this same structure for a transaction between National Performance Agency ("NPA") and lending entities formed by the Habematolel Pomo of Upper Lake, a federally recognized Native American tribe ("Upper Lake").

161. Pursuant to a "Services Agreement" between NPA and Silver Cloud one of Upper Lake's lending entities, NPA agreed to provide essentially all services setup and run the lending operations, including: (1) personnel and equipment to receive and respond to incoming telephone calls, faxes, and emails from Silver Cloud's borrowers; (2) delivery of electronic files for all debits and credits to each borrowers' loan; (3) lead generation; (4) receipt and storage of application materials; (5) servicing of the loans, including collection of payments; and (6) delivery of information "to determine whether to fund the loans" and "credit such potential customers' accounts with the appropriate amounts" for debits and credits. Ex. 5 at 2264–65.

162. Additionally, nearly all of the revenue went to NPA and its partners, primarily through the use of "Participation Agreements."

163. Rather than being the direct lender, this "participation model" allowed NPA to purchase essentially all of the economic interests in the loan as detailed in NPA's Business Plan and Roadmap dated January 2012. Ex. 6 at 755 (explaining various "structural approaches to tribal deals," including a participation model "in which NPA purchases a 99% participation in the loans the tribe makes.").

164. The participation model, in other words, entitled NPA and its affiliated companies entitled to nearly all of the income and any profits from the loans while, at the same time, disguising its role and creating the façade that the loans were from a tribal government.

165. The Rosette law firm also setup the enterprise between Think Finance and Great Plains, which used a similar structure of servicing and participation agreements. *See* Ex. 7.

166. In addition to the servicing agreement, the tribal lending model involves the use of a loan and security agreement between the tribe and the payday lender.

167. Typically, in exchange for the millions of dollars in capital to fund the illegal loans, these loan and security agreements require: (1) access to the books and records for each tribal lender; (2) monthly statements regarding the business (especially with respect to its credit and debits on loans); (3) deposit control agreements; (4) prioritized disbursements; (5) granting of a security interest in the loans; (6) restrictions on the use of the proceeds; (7) mandatory interest rates to be imposed on the loans to consumers; (8) servicing requirements for the collection of the loans, including the use of certain third parties; (9) prohibitions on the change of business policies; (10) rights to assume the business in the event of default on the repayment of the capital; and (11) waivers of sovereign immunity for the Tribe and its entities. *See generally* Ex. 8.

168. According to a lawsuit filed by former employees, "Rosette has set up more than thirty payday loan enterprises at more than a dozen tribes." *Williams & Cochrane, LLP v. Quechan Tribe of Fort Yuma Indian Reservation*, 2018 WL 2734946, at *5 (S.D. Cal. June 7, 2018).

169. The Rosette firm has represented the Lac du Flambeau Band of Lake Superior Chippewa Indians, including in its internet lending endeavors.

**D. The LDF's Billion-Dollar Usurious Lending Enterprise.**

170. As explained above, all of the Plaintiffs were class members in a lawsuit styled *Fitzgerald v. Wildcat*, Case No. 3:20-cv-00044(NKM/JCH).

171. The *Fitzgerald* litigation culminated in a nationwide class settlement requiring the repayment more than $37 million dollars, as well as the cancellation of more than $1,400,000,000.00 of loans by the tribal lending entities, including Bridge Lending, Evergreen Services, Avail Blue, Lendgreen, Radiant, LundUMo, Nine Torches, National Small Loan, MitigCapital, and Blue River Lending. *See Fitzgerald v. Wildcat*, Case No. 3:20-cv-00044 (W.D. Va.), Dkt. 201 (Dec. 17, 2024 Order). Although *Fitzgerald* involved the Tribe and its officials, who could be identified from publicly available information, other major participants in the Usurious Lending Enterprise alleged herein, including the named Defendants, intentionally concealed their involvement and thus were not identified until August 2024. Those participants, including Defendants, were expressly excluded from the nationwide class settlement in *Fitzgerald*.

**i. The role of Dan Koetting, Jairo Perez, GDA Consulting, KP Investment Group, BCM, and Envision Management in the Usurious Lending Enterprise**

172. Defendant Dan Koetting has been in the payday lending industry for more than 10 years. Prior to partnering with the LDF, Dan Koetting was the chief executive officer of Rockhill Consulting Group, LLC, which engaged in a rent-a-tribe venture with the Big Lagoon Rancheria,

a federally recognized tribe of Yurok and Tolowa Indians. *See JPV I L.P. v. Koetting*, 88 Cal.App.5th 172, 179 (2023).

173. Defendant Jairo Perez is Dan Koetting's business partner, including in Koetting's payday lending ventures like Rockhill Consulting.

174. Pursuant to servicing agreements with Big Lagoon Racheria, Dan Koetting and Perez's company was responsible for running the operations and managing the lending programs for tribal lending entities created in the name of the Big Lagoon Rancheria. *Id.*

175. In 2017, however, the relationship between Dan Koetting and Big Lagoon Rancheria "began to deteriorate," prompting Dan Koetting to seek out a relationship with a new tribe to continue his usurious lending. *Id.*

176. By August 2017, Dan Koetting found the new tribe, LDF, who created Biboon, LLC, d/b/a Bridge Lending Solutions to facilitate Koetting and Perez's usurious lending.

177. On August 18, 2017, one of Dan Koetting and Perez's companies, GDA Consulting, entered into a servicing agreement with LDF for the operations of Bridge Lending.

178. Like the other servicing contracts described above, Dan Koetting's arrangement with the Tribe provided Koetting and Perez with authority and responsibility over every material aspect of Bridge Lending's operations, the exclusive right to originate, renew, service, and collect loans made in the name of Bridge Lending Solutions.

179. Among other things and typical of the tribal lending model, the servicing agreement provided GDA (and hence Defendants Koetting and Perez) with sole authority and responsibility for marketing, underwriting, servicing, electronic data storage, vendor selection and maintenance, loan administration, and collections.

180. Because they ran the operations, Defendants GDA, Dan Koetting and Perez received virtually all of the profits from the usurious loans made in the name of Bridge Lending Solutions—except for a nominal flat-fee returned to the LDF for allowing it to serve as a front for the illegal lending activities.

181. In addition to the servicing agreement, another one of Dan Koetting and Perez's companies, KP Investment Group, LLC, entered into a loan agreement with Bridge Lending, which provided the money to fund the loans.

182. In exchange for the millions of dollars in capital to fund the illegal loans in the name of Bridge Lending, discovery will show that this loan agreement required Bridge Lending to provide KP Investments with: (1) access to its books and records; (2) deposit control agreements; (3) a security interest in the loans; (4) restrictions on the use of the proceeds; (5) mandatory interest rates to be imposed on the loans to consumers; (6) servicing requirements for the collection of the loans; (7) prohibitions on the change of business policies; (8) rights to assume the business in the event of default on the repayment of the capital; and (9) waivers of sovereign immunity for the Tribe and its entities.

183. On May 1, 2023, Bridge Lending entered into an amended servicing agreement with another company, Benchmark Consulting and Management, LLC ("BCM"), which is also owned by Koetting and Perez.

184. The purpose of the amended services agreement appears to be to increase the amount of money received by the LDF. However, the amended servicing agreement continued to provide BCM (and hence Defendants Koetting and Perez) with sole authority and responsibility for marketing, underwriting, servicing, electronic data storage, vendor selection and maintenance, loan administration, and collections.

185. To minimize risk in the event the portfolio was shut down or sued, Dan Koetting and Perez worked with the LDF on the creation of a second entity, Opichi, LLC d/b/a Evergreen Services ("Evergreen Services").

186. To that end, on December 5, 2020, another one of Dan Koetting and Perez's companies, Envision Management, entered into a servicing agreement with LDF for the operations of Evergreen Services.

187. Like the other servicing contracts described above, this second arrangement with the Tribe provided Dan Koetting and Perez with authority and responsibility over every material aspect of Evergreen Services' operations, including the exclusive right to originate, renew, service, and collect loans made in the name of Evergreen Services.

188. In addition, the servicing agreement provided Envision Management (and hence Defendants Koetting and Perez) with sole authority and responsibility for marketing, underwriting, servicing, electronic data storage, vendor selection and maintenance, loan administration, and collections.

189. Because they ran the operations, Defendants Envision Management, Dan Koetting and Perez received virtually all of the profits from the usurious loans made in the name of Evergreen Services—except for a nominal flat-fee returned to the LDF for allowing it to serve as a front for the illegal lending activities.

190. Similarly, KP Investment Group, LLC, entered into a loan agreement with Evergreen Services, which provided the money to fund the loans.

191. In exchange for the millions of dollars in capital to fund the illegal loans, discovery will show that this loan agreement required Evergreen Services to provide KP Investments with: (1) access to its books and records; (2) deposit control agreements; (3) a security interest in the

loans; (4) restrictions on the use of the proceeds; (5) mandatory interest rates to be imposed on the loans to consumers; (6) servicing requirements for the collection of the loans; (7) prohibitions on the change of business policies; (8) rights to assume the business in the event of default on the repayment of the capital; and (9) waivers of sovereign immunity for the Tribe and its entities.

192. In sum, while the LDF held itself out as the actual lender of the loans issued in the name of Bridge Lending and Evergreen Services, the tribal entities were merely fronts, and Defendants Dan Koetting and Perez provided the infrastructure to market, fund, underwrite, and collect the loans, including by providing the following services: marketing, lead generation, technology platforms, payment processing, servicing and collection procedures. And Defendants Dan Koetting and Perez's other company provided the capital to make the loans.

193. Upon information and belief, tribal members did not participate in the day-to-day operations of Bridge Lending or Evergreen Services and nearly all the activities associated with the lending operation occurred off the LDF's Reservation, such as the call centers, payment processing, and servicing of the loans.

194. Put differently, nearly all activities performed on behalf of Bridge Lending and Evergreen Services were performed by non-tribal officers and employees of Defendants GDA, Envision Management, and BCM, who were located in offices off the reservation.

195. Upon information and belief, the money loaned to borrowers (including Plaintiffs Brady, Digorgio, Hicks, Shores, Barragan, Eland, Rowland, Savaski, Ray, Ciotti, Smith, Howell, Brown, and Lawson) was transferred from a bank account owned and operated or controlled by Defendants Dan Koetting and Perez, and neither the LDF nor its Tribal Council were allowed to access to the accounts that debited and credited payments from consumers.

**ii. The role of Mark Koetting, Russell Myrick, MRC, and PG2, LLC in the Usurious Lending Enterprise.**

196. Like his brother, Defendant Mark Koetting has been in the payday lending industry for more than 10 years. Prior to partnering with the LDF, Mark Koetting was the chief executive officer of Redondo Management, LLC, which also engaged in a rent-a-tribe venture with the. *See JPV I L.P. v. Koetting*, 88 Cal.App.5th 172, 179 (2023).

197. Defendant Russell Myrick is Dan Koetting's business partner.

198. Pursuant to servicing agreements with Big Lagoon Racheria, Mark Koetting's company was responsible for running the operations and managing the lending programs for tribal lending entities created in the name of the Big Lagoon Rancheria. *Id*.

199. However, when the relationship between the Koetting's and Big Lagoon Rancheria "began to deteriorate" in 2017, Mark Koetting also sought out a relationship with a new tribe to continue his usurious lending. *Id*.

200. Like his brother, Mark Koetting reached an agreement with the LDF, who created Anong, LLC d/b/a Avail Blue to facilitate Mark Koetting's and Myrick's usurious lending.

201. To that end, on August 18, 2017, one of Mark Koetting and Myrick's companies, MRC Consulting, LLC ("MRC") entered into a servicing agreement with LDF for the operations of Avail Blue.

202. Like the other servicing contracts described above, Mark Koetting's arrangement with the Tribe provided Koetting and Myrick with authority and responsibility over every material aspect of Avail Blue's operations, the exclusive right to originate, renew, service, and collect loans made in the name of Avail Blue.

203. Among other things and typical of the tribal lending model, the servicing agreement provided MRC (and hence Defendants Mark Koetting and Myrick) with sole authority and

responsibility for marketing, underwriting, servicing, electronic data storage, vendor selection and maintenance, loan administration, and collections.

204. Because they ran the operations, Defendants MRC, Mark Koetting and Myrick received virtually all of the profits from the usurious loans made in the name of Avail Blue—except for a nominal flat-fee returned to the LDF for allowing it to serve as a front for the illegal lending activities.

205. In addition to the servicing agreement, another one of Mark Koetting and Myrick's companies, Defendant PG2, LLC, entered into a loan agreement with Avail Blue.

206. The purpose of the loan agreement was to provide the money to fund the loans made in the name of Avail Blue.

207. In exchange for the millions of dollars in capital to fund the illegal loans in the name of Avail Blue, discovery will show that this loan agreement required Avail Blue to provide PG2 with: (1) access to its books and records; (2) deposit control agreements; (3) a security interest in the loans; (4) restrictions on the use of the proceeds; (5) mandatory interest rates to be imposed on the loans to consumers; (6) servicing requirements for the collection of the loans; (7) prohibitions on the change of business policies; (8) rights to assume the business in the event of default on the repayment of the capital; and (9) waivers of sovereign immunity for the Tribe and its entities.

208. Because they ran the operations, Defendants Mark Koetting, Myrick, MRC, and PG2 received virtually all of the profits from the usurious loans made in the name of Avail Blue—except for a nominal flat-fee returned to the LDF for allowing it to serve as a front for the illegal lending activities.

209. In sum, while the LDF held itself out as the actual lender of the loans issued in the name of Avail Blue, it was merely a front, and Defendants Mark Koetting, Myrick, and MRC provided the infrastructure to market, fund, underwrite, and collect the loans, including by providing the following services: marketing, lead generation, technology platforms, payment processing, servicing and collection procedures. And Defendant Mark Koetting and Myrick's other company, PG2, provided the capital to make the loans.

210. Upon information and belief, tribal members did not participate in the day-to-day operations of Avail Blue and nearly all the activities associated with the lending operation occurred off the LDF's Reservation, such as the call centers, payment processing, and servicing of the loans.

211. Put differently, nearly all activities performed on behalf of Avail Blue were performed by non-tribal officers and employees of Defendants Mark Koetting, Myrick and MRC, who were located in offices off the reservation.

212. Upon information and belief, the money loaned to borrowers (including Plaintiffs Thomas and Simpson) was transferred from a bank account owned and operated or controlled by Defendants Mark Koetting and Myrick, and neither the LDF nor its Tribal Council were allowed to access to the accounts that debited and credited payments from consumers.

**iii. The role of 4finance, Vivus, Bettiol, and Walker in the Usurious Lending Enterprise.**

213. 4finance is one of the "largest digital consumer lending groups with operations in 11 countries." 4finance, ABOUT US, available at: https://www.4finance.com/company/about-us (last visited Jan. 2, 2025).

214. Over the past fifteen years, 4finance "has grown rapidly, issuing over" $10 billion loans "since inception," including products such as "single payment loans, instalment loans and lines of credit." *Id.*

215. "4finance operates a portfolio of market leading brands," many of which are payday lending products "to millions of customers who are typically underserved by conventional providers." *Id.*

216. As part of its effort to make usurious loans in the United States, 4finance created a subsidiary named Vivus Servicing, Ltd., in an effort to conceal its role in the tribal lending scheme.

217. As early as August 5, 2013, Vivus entered into a servicing agreement with LDF for the operations of a tribal lending entity doing business as Lendgreen.

218. After Vivus entered into the servicing agreement with Lendgreen, Vivus assigned those rights to 4finance.

219. Like the other servicing contracts described above, this arrangement with the Tribe provided Vivus (and hence 4finance) with authority and responsibility over every material aspect of Lendgreen's operations, the exclusive right to originate, renew, service, and collect loans made in the name of Lendgreen.

220. Among other things and typical of the tribal lending model, the servicing agreement provided Vivus/4finance with sole authority and responsibility for marketing, underwriting, servicing, electronic data storage, vendor selection and maintenance, loan administration, and collections.

221. Because they ran the operations, Defendants Vivus/4finance received virtually all of the profits from the usurious loans made in the name of Lendgreen—except for a nominal flat-fee returned to the LDF for allowing it to serve as a front for the illegal lending activities.

222. In addition to the servicing agreement, another one of 4finance's affiliates, GMLA Trading Ltd., entered into a loan agreement with Lendgreen.

223. The purpose of the loan agreement was to provide the money to fund the loans made in the name of Lendgreen.

224. In exchange for the millions of dollars in capital to fund the illegal loans in the name of Lendgreen, discovery will show that this loan agreement required Lendgreen to provide GMLA Trading, Ltd. (and thus 4finance), with: (1) access to its books and records; (2) deposit control agreements; (3) a security interest in the loans; (4) restrictions on the use of the proceeds; (5) mandatory interest rates to be imposed on the loans to consumers; (6) servicing requirements for the collection of the loans; (7) prohibitions on the change of business policies; (8) rights to assume the business in the event of default on the repayment of the capital; and (9) waivers of sovereign immunity for the Tribe and its entities.

225. In sum, while the LDF held itself out as the actual lender of the loans issued in the name of Lendgreen, it was merely a front, and Defendants Vivus/4finance provided the infrastructure to market, fund, underwrite, and collect the loans, including by providing the following services: marketing, lead generation, technology platforms, payment processing, servicing and collection procedures. And 4finance's other company, GMLA Trading, provided the capital to make the loans.

226. Upon information and belief, tribal members did not participate in the day-to-day operations of Lendgreen and nearly all the activities associated with the lending operation occurred off the LDF's Reservation, such as the call centers, payment processing, and servicing of the loans.

227. Put differently, nearly all activities performed on behalf of Lendgreen were performed by non-tribal officers and employees of Defendants Vivus/4finance (such as Defendants Bettiol and Walker), who were located in offices off the reservation.

228. Upon information and belief, the money loaned to borrowers was transferred from a bank account owned and operated or controlled by Defendants Vivus/4finance, and neither the LDF nor its Tribal Council were allowed to access to the accounts that debited and credited payments from consumers.

229. Defendant Mark Bettiol is the former chief executive officer and managing director of 4finance.

230. As the chief executive officer and managing director of 4finance, Bettiol helped design and implement Lendgreen's usurious lending business, including approval of key decisions related to the marketing, underwriting, servicing, and collection of the loans originated in the name of Lendgreen.

231. Indeed, according to his profile on Linkedin, Bettiol built 4finance from "start up to over 200 employees," and established "all key organization functions," including "marketing, sales, collections, software development, risk & analytics."

232. Bettiol's profile further boasts that he built "from 0 to loan volume over $100M in six years," as well as established "innovative business models" that "managed 3 brands in 44 States."

233. Upon information and belief, one of these brands was Lendgreen.

234. Upon information and belief, Bettiol personally signed the servicing agreement on behalf of Vivus for the establishment, implementation, and operation of Lendgreen.

235. Prior to the signing of the servicing agreement, Bettiol personally reviewed the agreement and knowingly consented to its terms, including the design and structure that provided 4finance (through Vivus) with the authority and responsibility over every material aspect of

Lendgreen's operations, the exclusive right to originate, renew, service, and collect loans made in the name of Lendgreen.

236. In addition to Bettiol, Mary Jo Walker was highly instrumental in the development and operations of Lendgreen, including helping in the origination and collection of the debts under the auspices of the LDF even though her company, 4finance, had authority and control over the illegal lending entity.

237. Upon information and belief, Mary Jo Walker was the primary point of contact between LDF and 4finance and frequently communicated with the LDF for the purposes of furthering the illegal lending through Lendgreen.

238. Upon information and belief, Mary Jo Walker oversaw the employees and regularly attended meetings related to 4finance's dubious lending through Lendgreen.

**iv. The role of MoneyLion, Correia, Choubey, Salt Lake Capital, and HarrowGate in the Usurious Lending Enterprise.**

239. MoneyLion advertises itself as a "FinTech" company that issues low-dollar loans and other financial products to consumers. *See* MoneyLion, Empowering America's Financial Decisions, https://www.moneylion.com/about/ (last visited Jan. 9, 2025).

240. MoneyLion has issued millions of payday loans and other financial products to consumers since its founding by Defendant Choubey in 2013. In 2024, the MoneyLion mobile application was the most downloaded application in the finance category and among the top ten most downloaded applications overall in the Apple AppStore.

241. As of 2019, MoneyLion was valued at nearly $700 million.

242. As part of its effort to make usurious loans in the United States, MoneyLion created a subsidiary named Salt Lake Capital, LLC, in an effort to conceal its role in the tribal lending scheme.

243. As early as February 27, 2017, Salt Lake Capital entered into a servicing agreement with LDF for the operations of a tribal lending entity doing business as Radiant Cash.

244. Upon information and belief, Salt Lake Capital assigned to MoneyLion its rights under the servicing agreement with LDF.

245. Like the other servicing contracts described above, this arrangement with the Tribe provided Salt Lake Capital (and hence MoneyLion) with authority and responsibility over every material aspect of Radiant's operations, the exclusive right to originate, renew, service, and collect loans made in the name of Radiant.

246. Among other things and typical of the tribal lending model, the servicing agreement provided Salt Lake Capital/MoneyLion with sole authority and responsibility for marketing, underwriting, servicing, electronic data storage, vendor selection and maintenance, loan administration, and collections.

247. Because they ran the operations, Defendants Salt Lake Capital/MoneyLion received virtually all of the profits from the usurious loans made in the name of Radiant—except for a nominal flat-fee returned to the LDF for allowing it to serve as a front for the illegal lending activities.

248. In addition to the servicing agreement, another one of Salt Lake Capital's affiliates, HarrowGate, entered into a loan agreement with Radiant as early as 2013.

249. The purpose of the loan agreement was to provide the money to fund the loans made in the name of Radiant.

250. In exchange for the millions of dollars in capital to fund the illegal loans in the name of Radiant, discovery will show that this loan agreement required Radiant to provide HarrowGate, with: (1) access to its books and records; (2) deposit control agreements; (3) a

security interest in the loans; (4) restrictions on the use of the proceeds; (5) mandatory interest rates to be imposed on the loans to consumers; (6) servicing requirements for the collection of the loans; (7) prohibitions on the change of business policies; (8) rights to assume the business in the event of default on the repayment of the capital; and (9) waivers of sovereign immunity for the Tribe and its entities.

251. In sum, while the LDF held itself out as the actual lender of the loans issued in the name of Radiant, it was merely a front, and Defendants MoneyLion, Salt Lake Capital, and HarrowGate provided the infrastructure to market, fund, underwrite, and collect the loans, including by providing the following services: marketing, lead generation, technology platforms, payment processing, servicing and collection procedures.

252. Upon information and belief, tribal members did not participate in the day-to-day operations of Radiant and nearly all the activities associated with the lending operation occurred off the LDF's Reservation, such as the call centers, payment processing, and servicing of the loans.

253. Indeed, the archived domain name registration for Radiant's website, radiantcash.com, shows that the domain was registered to MoneyLion LLC, with Defendant Choubey's MoneyLion email address and his own former home address also listed as the contact for the registration.

254. A software architect and the Director of IT Infrastructure at MoneyLion's Malaysian office have also indicated that they worked on the Radiant website while employed by MoneyLion.

255. Put differently, nearly all activities performed on behalf of Radiant were performed by non-tribal officers and employees of Defendants MoneyLion and Salt Lake Capital (such as Defendants Choubey and Correia), who are located in offices off the reservation.

256. As just one example, the director of operations at Radiant from 2014 to 2016, Carol Laib, worked out of a call center whose South Dakota address belonged to MoneyLion. Ms. Laib was also the managing director of MoneyLion's Salt Lake City operations at the same time she served as director of operations at Radiant. Thus, Radiant was operated by MoneyLion employees from a business address owned and operated by MoneyLion.

257. The server that hosts website from which Radiant issues loans to consumers, including the loans issued to each Plaintiff by Radiant, is also located in Ashburn, Virginia, more than 1,000 miles from the LDF's reservation.

258. Upon information and belief, the money loaned to borrowers was transferred from a bank account owned and operated or controlled by Defendants MoneyLion/Salt Lake Capital, and neither the LDF nor its Tribal Council were allowed to access to the accounts that debited and credited payments from consumers.

259. MoneyLion and its wholly-owned subsidiaries and other affiliates and agents under its control, including Salt Lake Capital and HarrowGate, are therefore the entities and individuals that in fact underwrite, approve, fund, and service the loans issued by Radiant, using bank accounts that are entirely under their—and not the Tribe's—control. Neither the LDF nor its Tribal Council were allowed to access to the accounts that debited and credited payments from consumers.

260. Defendant Choubey is the cofounder and chief executive officer of MoneyLion and managing director of HarrowGate.

261. In these roles, Choubey helped design and implement, and currently oversees, Radiant's usurious lending business, including approval of key decisions related to the marketing, underwriting, servicing, and collection of the loans originated in the name of Radiant.

262. Indeed, according to MoneyLion's website, Choubey has been CEO of MoneyLion "since [its] inception."

263. In a 2019 Forbes profile, Choubey boasted that MoneyLion seeks to be "the private bank for the $50,000 household,"[6] highlighting MoneyLion's goal to target primarily low-income consumers.

264. Choubey also personally signed the loan agreement on behalf of HarrowGate that provided the funding for Radiant's lending operations.

265. Prior to the signing of the loan agreement, Choubey personally reviewed the agreement and knowingly consented to its terms, including the design and structure that provided HarrowGate and MoneyLion (through its subsidiaries and affiliates) with the authority and responsibility over every material aspect of Radiant's operations, including the exclusive right to originate, renew, service, and collect loans made in the name of Radiant.

266. In addition to Choubey, Richard Correia has been highly instrumental in the development and operations of Radiant since he joined MoneyLion as its President and CFO in 2016, including helping in the origination and collection of the debts under the auspices of the LDF even though Salt Lake Capital, the company that he manages, had authority and control over Radiant's operations.

267. Indeed, Correia was the individual who signed the servicing agreement between Radiant and Salt Lake Capital that ceded control of Radiant's operations to Salt Lake Capital. Correia personally reviewed this agreement and consented to its terms, including the design and structure that provided Salt Lake Capital, HarrowGate, and MoneyLion with the authority and

[6] *See* Jeff Kauflin, *Dawn of the Neobank: The Fintechs Trying to Kill the Corner Bank*, Forbes (Nov. 4, 2019), https://www.forbes.com/sites/jeffkauflin/2019/11/04/dawn-of-the-neobank-the-fintechs-trying-to-kill-the-corner-bank/ (last visited Jan. 9, 2025).

responsibility over every material aspect of Radiant's operations, including the exclusive right to originate, renew, service, and collect loans made in the name of Radiant.

268. Upon information and belief, Correia was the primary point of contact between LDF and Salt Lake Capital and frequently communicated with the LDF for the purposes of furthering the illegal lending through Radiant.

269. Upon information and belief, Correia and Choubey oversaw the employees and regularly attended meetings related to Salt Lake Capitla's dubious lending through Radiant.

**v. The role of Jesus Diaz, Oscar Rodriguez, Unified Analytics, and National Techmark in the Usurious Lending Enterprise.**

270. Defendants Jesus Diaz and Oscar Rodriguez are business partners who live in Gainesville, Florida.

271. Defendants Diaz and Rodriguez are co-owners and co-founders of two companies, Unified Analytics and National Techmark. *See Sec. & Exch. Comm'n v. 1 Glob. Cap. LLC*, 2018 WL 8050527, at *2 (S.D. Fla. Dec. 27, 2018).

272. According to a settlement agreement with the Securities and Exchange Commission, Diaz and Rodriguez obtained a $5.8 million dollar loan from Ganador Enterprises and "approximately $ 2 million went to Unified and $ 3.8 million went to Techmark pursuant to two separate promissory notes[.]" *Id*.

273. The "monies provided to Unified appear to have been used to pay overhead, develop software processes, and cover other expenses related to a short term consumer lending business with a Native American tribe[.]" *Id*.

274. And the "monies provided to Techmark appear to have been loaned by Techmark to the Native American tribe to fund the short-term consumer loans[.]" *Id*.

275. More specifically, on or around June 9, 2015, Unified Analytics entered into a servicing agreement with LDF related to the operations of National Small Loan.

276. Like the other servicing contracts described above, the arrangement with the Tribe provided Diaz and Rodriguez with authority and responsibility over every material aspect of National Small Loan's operations, the exclusive right to originate, renew, service, and collect loans made in the name of National Small Loan.

277. Among other things and typical of the tribal lending model, the servicing agreement provided Unified Analytics (and hence Defendants Diaz and Rodriguez) with sole authority and responsibility for marketing, underwriting, servicing, electronic data storage, vendor selection and maintenance, loan administration, and collections.

278. Because they ran the operations, Defendants Unified Analytics, Diaz, and Rodriguez received virtually all of the profits from the usurious loans made in the name of National Small Loan—except for a nominal flat-fee returned to the LDF for allowing it to serve as a front for the illegal lending activities.

279. In addition to the servicing agreement, one of Diaz and Rodriguez's other companies, National Techmark, entered into a loan agreement with National Small Loan, which provided the money to fund the loans.

280. In exchange for the millions of dollars in capital to fund the illegal loans in the name of National Small Loan, discovery will show that this loan agreement required National Small Loan to provide Techmark with: (1) access to its books and records; (2) deposit control agreements; (3) a security interest in the loans; (4) restrictions on the use of the proceeds; (5) mandatory interest rates to be imposed on the loans to consumers; (6) servicing requirements for the collection of the loans; (7) prohibitions on the change of business policies; (8) rights to assume

the business in the event of default on the repayment of the capital; and (9) waivers of sovereign immunity for the Tribe and its entities.

281. In sum, while the LDF held itself out as the actual lender of the loans issued in the name of National Small Loan, it was a front, and Defendants Diaz and Rodriguez provided the infrastructure to market, fund, underwrite, and collect the loans, including by providing the following services: marketing, lead generation, technology platforms, payment processing, servicing and collection procedures. And Diaz and Rodriguez's other company provided the capital to make the loans.

282. Upon information and belief, tribal members did not participate in the day-to-day operations of National Small Loan and nearly all the activities associated with the lending operation occurred off the LDF's Reservation, such as the call centers, payment processing, and servicing of the loans.

283. Put differently, nearly all activities performed on behalf of National Small Loan were performed by non-tribal officers and employees of Defendants Unified Analytics and National Techmark, who were located in offices off the reservation.

284. Upon information and belief, the money loaned to borrowers was transferred from a bank account owned and operated or controlled by Defendants Diaz and Rodriguez, and neither the LDF nor its Tribal Council were allowed to access to the accounts that debited and credited payments from consumers.

**E. Plaintiffs' Experience and Loan Histories.**

285. Because of the ostensible protections created by the tribal business model, the interest rates charged on the loans were more than 40 to 75 times the amount permitted by state usury and licensing laws.

286. For example, Plaintiff Jeffrey Bradby applied for and obtained a loan from Bridge Lending in December 2017 from his home in Virginia for a principal amount of $650, which had a triple-digit interest rate far exceeding Virginia's 12-percent interest rate cap on unlicensed loans. Mr. Bradby paid back more than the borrowed amount on this loan from his bank account maintained in Virginia.

287. From her home in North Carolina, Plaintiff Kimberly Webb applied for and obtained three loans from Bridge Lending for less than $500 each in 2023 and 2024 and two $300 loans from National Small Loan in 2019 and 2021, which had a minimum interest rate of 499.99% and rates as high as 806.74%, far exceeding North Carolina's 16-percent usurious interest cap. Using her bank account maintained in North Carolina, Ms. Webb paid back more than the amounts she borrowed on these loans.

288. From his home in Florida, Plaintiff Raymond DiGiorgio applied for and obtained loans from Bridge Lending and Evergreen Services for $450.00 each in 2022 and 2023, respectively, each of which had a triple-digit interest rate far exceeding Florida's 18-percent rate cap. Using his bank account maintained in Florida, Mr. DiGiorgio paid back over $1,600 on the $450 loan issued by Evergreen, and more than $1,500 on the $450 loan issued by Bridge Lending.

289. From her home in California, Plaintiff Ashley Hicks applied for and obtained several loans from Bridge Lending, Lendgreen, and Evergreen Services of less than $1,500 each between 2016 and 2023, which had a minimum interest rate of 647.89%, far exceeding California's 12-percent rate cap. Using her bank account maintained in California, Ms. Hicks paid back more than she borrowed on all but one of these loans.

290. From his home in California, Plaintiff Ronald Shores applied for and obtained at least two loans from Bridge Lending of $500 and $800 in 2022 and 2023, respectively, each of

which had a triple-digit interest rate far exceeding California's 12-percent rate cap. Using his bank account maintained in California, Mr. Shores paid back $3,020 on his $800 loan and $2,338.00 on his $500 loan.

291. From her home in California, Plaintiff Rachael Simpson applied for and obtained a loan from Avail Blue in 2023 for $500.00, which had an interest rate of 780.00%, far exceeding California's 12-percent rate cap. Using her bank account maintained in California, Ms. Simpson paid back $1,305.00 on her loan.

292. From his home in California, Plaintiff Martin Rowland applied for and obtained a loan from Bridge Lending for $450.00 in 2023, which had a triple-digit interest rate far exceeding California's 12-percent rate cap. Using his bank account maintained in California, Mr. Rowland paid back $1,341.00 on his loan.

293. From her home in Michigan, Plaintiff Shelly Thomas applied for and obtained several loans from Avail Blue for less than $1,500 each between 2018 and 2023, which had a minimum interest rate of 431.42%, far exceeding Michigan's 7-percent rate cap, and even the 25% threshold for criminal liability. Using her bank account maintained in Michigan, Ms. Thomas paid back more than she borrowed on each of these loans.

294. From his home in California, Plaintiff Angel Barragan applied for and obtained three loans—two from Bridge Lending and one from Evergreen Services—in 2022 and 2023 for $700, $550, and $1,000, respectively, which had a minimum interest rate of 535.69%, far exceeding California's 12-percent rate cap. Using his bank account maintained in California, Mr. Barragan paid back more than he borrowed on each of these loans.

295. From his home in Florida, Plaintiff Justin Reagan applied for and obtained a loan from National Small Loan in 2019 for $600.00, which had an interest rate of 891.89%, far

exceeding Florida's 18-percent rate cap. Using his bank account maintained in Florida, Mr. Reagan paid back nearly double the principal balance of this loan.

296. From his home in Mississippi, Plaintiff Kevin Savaski applied for and obtained a loan from Bridge Lending in 2023 for $500.00, which had triple-digit interest rate far exceeding Mississippi's 20-percent rate cap. Using his bank account maintained in Mississippi, Mr. Savaski paid back $2,155.00 on this loan.

297. From her home in Michigan, Plaintiff Sandra Ray applied for and obtained several loans from Bridge Lending and Evergreen Services for less than $500 each between 2019 and 2020, each of which had a triple-digit interest rate far exceeding Michigan's 7-percent rate cap, and even the 25% threshold for criminal liability. Using her bank account maintained in Michigan, Ms. Ray paid back more than she borrowed on all but one of these loans, including paying more than $1,000 on a loan for only $300.

298. From his home in Michigan, Plaintiff David Eland applied for and obtained several loans from Bridge Lending, Evergreen Services, and National Small Loan for less than $1,500 each between 2019 and 2022, which had interest rates as high as 672.42%, with all other rates in the triple digits, far exceeding Michigan's 7-percent rate cap, and even the 25% threshold for criminal liability. Using his bank account maintained in Michigan, Mr. Eland paid back more than he borrowed on all but one of these loans, including paying close to $3,000 for a loan of only $700 and over $2,500 for a loan of only $550.

299. From her home in Texas, Plaintiff Diana Matthews applied for and obtained two loans from Lendgreen for $800 each in 2016 and 2017, each of which had triple-digit interest rates far exceeding Texas's 10-percent rate cap. Using her bank account maintained in Michigan, Ms. Matthews paid back more than she borrowed on each of these loans.

300. From his home in Maryland, Plaintiff David Ciotti applied for and obtained five loans from Bridge Lending for $500 or less in 2018, each of which had triple-digit interest rates far exceeding Maryland's 33-percent rate cap. Using his bank account maintained in Maryland, Mr. Ciotti paid back more than he borrowed on each of these loans, including paying more than $2,300 for a loan of only $800.

301. From his home in Missouri, Plaintiff Brad Smith applied for and obtained a loan from Evergreen Services for $450.00 in 2023, which had an interest rate of 721.31%, far exceeding Missouri's 10-percent rate cap. Using his bank account maintained in Missouri, Mr. Smith paid back more than $1,600 on this single loan.

302. From her home in Missouri, Plaintiff Chanelle Howell applied for and obtained a loan from Evergreen Services for $250.00 in 2020, which had a triple-digit interest rate far exceeding Missouri's 10-percent rate cap. Using her bank account maintained in Missouri, Ms. Howell paid back more than double what she borrowed on this loan.

303. From her home in California, Plaintiff Robin Brown applied for and obtained several loans from Bridge Lending of $500 or less each between 2017 and 2023, which had a minimum interest rate of 492.84%, far exceeding California's 12-percent rate cap. Using her bank account maintained in California, Ms. Brown paid back more than she borrowed on each of these loans.

304. From his home in Pennsylvania, Plaintiff Michael Waller obtained three loans from Radiant of $800 or less each between 2016 and 2017, each of which had a triple-digit interest rate far exceeding Pennsylvania's 6-percent rate cap for unlicensed loans. Using his bank account maintained in Pennsylvania, Mr. Waller paid back to Radiant more than he borrowed on all but one of these loans.

305. From his home in Florida, Plaintiff James Lawson applied for and obtained several loans from Bridge Lending for $900 or less each between 2017 and 2023, each of which had a triple-digit interest rate far exceeding Florida's 18-percent rate cap. Using his bank account maintained in Florida, Mr. Lawson paid back more than he borrowed on each of these loans, including paying over $3,000 for a loan of only $800.

306. From her home in Arizona, Plaintiff Huberta Lewis applied for and obtained several loans from Bridge Lending, Evergreen Services, and Avail Blue for $1050 or less each between 2018 and 2023, which had a minimum interest rate of 520.00%, far exceeding Arizona's 10-percent rate cap. Using her bank account maintained in Arizona, Ms. Lewis paid back more than she borrowed on nearly all of these loans.

307. From her home in Michigan, Plaintiff Melissa Melson applied for and obtained seven loans from Bridge Lending for $1150 or less each between 2022 and 2023, each of which had a triple-digit interest rate far exceeding Michigan's 7-percent rate cap, and even the 25% threshold for criminal liability. Using her bank account maintained in Michigan, Ms. Melson paid back more than she borrowed on all but one of these loans.

308. From her home in Washington, Plaintiff Jamie Dipino applied for and obtained six loans from Lendgreen for $1,500 or less each between 2018 and 2021, each of which had a triple-digit interest rate far exceeding Washington's 12-percent rate cap. Using her bank account maintained in Washington, Ms. Dipino paid back more than she borrowed on each of these loans.

309. From her home in Illinois, Plaintiff Gwendolyn Robinson applied for and obtained four loans from Lendgreen for $750 or less between 2019 and 2020, each of which had a triple-digit interest rate far exceeding Illinois's 36-percent rate cap. Using her bank account maintained in Illinois, Ms. Robinson paid back more than she borrowed on each of these loans.

310. Upon information and belief, none of the Defendants, nor the Tribe, the Tribal Officials, or the Tribal Lending Entities has ever obtained a license to issue loans to consumers in any state, including Plaintiffs' states of residence, let alone a license to issue the triple-digit interest loans to Plaintiffs and the putative class members.

311. Plaintiffs all applied for their loans on the internet while located in their respective states of residence. None of the Plaintiffs traveled to the Tribe's reservation to obtain their loans.

312. Plaintiffs all used their home addresses when applying for the loans, and they used bank accounts maintained in their home states to receive the loans and for the subsequent ACH debits used to pay down the loans.

313. As outlined above, the loans issued to Plaintiffs violated the respective usury statutes of each of their home states and entitle Plaintiffs to the remedies provided under those states' laws, including avoidance of the loans, repayment, at a minimum, of interest paid above the usury caps, if not principal and interest entirely, as well as exemplary damages.

314. Similarly, almost all other state jurisdictions treat as illegal unlicensed small loans like those involved here.[7]

---

[7] Most states recognize a similar public policy against usury and have adopted similar laws addressing high-interest loans. *See* Ala. Code § 5-18-4 (loans made without a license "shall be void"); Alaska Stat. § 06.20.310; Ariz. Rev. Stat. § 6-613(B) (loans that charge illegal finance charges are "voidable"); Ark. Code §§ 4-57-104, 105; Cal. Fin. Code §§ 22303, 22750; Colo. Rev. Stat. Ann. § 5-2-201; Conn. Gen. Stat. § 36a-558 (c)(1) (loans made without a license are "void" and uncollectable); Conn. Gen. Stat. § 36a-558 (c)(1) (loans made without a license are "void" and uncollectable); D.C. Code §§ 26-905, 28-3303; Fla. Stat. § 516.02 (loans made with excessive interest rates are "not enforceable"); Ga. Code § 16-17-3 (loans made without a license "shall be void ab initio"); Haw. Rev. Stat. § 478-4; Idaho Code § 28-46-402 (payday loans made without a license are "void, uncollectable and unenforceable"); 815 Ill. Comp. Stat. 122/4-10 (payday loans made without a license "shall be null and void"); Kan. Stat. § 16a-5-201; Ky. Rev. Stat. Ann. § 286.4-991 (loans made without a license are void); La. Stat. Ann. § 9:3552; Me. Rev. Stat. tit. 9-A, § 2-401; Mass. Gen. Laws Ann. ch. 140, § 110 (small loans made without a license are void); Md. Code, Com. Law § 12-314 (small loans made without a license that charge excessive interest rates are "unenforceable"); Mich. Comp. Laws §§ 438.32, 445.1854; Minn. Stat. §§ 47.60, 47.601

315. Despite the nearly universal prohibition against unlicensed, high-rate, small-loan lending, Defendants knowingly participated in a widespread scheme to make and collect the loans at issue in this case, which have victimized hundreds of thousands of consumers on terms similar to Plaintiffs.

### H. Facts Related to the Tolling for Any Injuries Suffered Outside the Statute of Limitations Period.

316. Tolling doctrines, including equitable tolling and fraudulent concealment, apply to RICO claims.

317. To establish equitable tolling, "[t]he circumstances preventing a party from pursuing his or her rights must be external to the party's own conduct." *Hengle v. Asner*, 433 F. Supp. 3d 825, 892 (E.D. Va. 2020) (quoting *CVLR Performance Horses, Inc. v. Wynne*, 792 F.3d 469, 478 (4th Cir. 2015)).

---

(provisions in loan contracts charging excessive interest rates are void and unenforceable); Minn. Stat. § 56.19 (authorizing debtor to recover all amounts paid on loans made in violation of licensing requirements); Miss. Code. § 75-67-119; Mont. Code § 31-1-712 (Any deferred deposit loan made by an unlicensed lender "is void, and the unlicensed person may not directly or indirectly collect, receive, or retain any loan principal, interest, fees, or other charges related to the loan"); Neb. Rev. Stat. § 45-1024; N.H. Rev. Stat. § 399-A:23 (any contract for small loan by unlicensed lender is "null and void"); N.M. Stat. § 58-15-3 (small loans made without a license are void); N.Y. Gen. Oblig. Law § 5-511 (usurious loans are "void"); N.Y. Banking Law § 355; N.C. Gen. Stat. § 53-166 (small loans made without a license are void); N.D. Cent. Code § 13-04.1-09.3 (West); Ohio Rev. Code Ann. § 1321.02 (small loans made without a license are void); Okla. Stat. tit. 14A, § 3-201; Or. Rev. Stat. § 725.045 (consumer finance loans made without a license are "void"); 41 P.S. §§ 501-502; 6 R.I. Gen. Laws § 6-26-4 (loans charging excessive interest "shall be usurious and void"); S.C. Code § 34-29-140; S.D. Codified Laws § 54-4-44 (loans charging excessive interest or made without a license are "void and uncollectible"); Tenn. Code §§ 47-14-110, 117; Tx. Fin. §§ 302.001-004; Vt. Stat. tit. 9, § 50; Va. Code § 6.2-1541(any loan made in violation of Virginia's usury and licensing laws "shall be void" and "any principal or interest paid on the loan shall be recoverable by the person by or for whom payment was made"); Wash. Rev. Code § 19.52.020; W. Va. Code § 46A-5-101; Wis. Stat. § 138.14; Wyo. Stat. § 40-14-521.

318. "Such circumstances must be extraordinary and include instances when 'wrongful conduct on the part of the defendant' prevents the plaintiff from asserting his claims." *Id.* (quoting *Wynne*, 792 F.3d at 478) (quoting *Harris v. Hutchinson*, 209 F.3d 325, 330 (4th Cir. 2000)).

319. Based on these standards, the Court previously found that "equity warrants tolling" of one plaintiffs' claims "***until at least June 2017***, when similarly situated consumers first filed suit against a tribal payday lending practice in this district," which put him on "notice that he could pursue similar claims in federal court." *Id.* (emphasis added).

320. By holding that the claims were tolled "until at least June 2017," the Court left open the question of whether tolling was appropriate after June 2017.

321. Under the circumstances, Plaintiffs believe that the statute of limitation should be equitably tolled until ***at least*** August 18, 2023,[8] which is the first date that any court issued a ruling relating to the contracts at issue in this case. *See Fitzgerald*, No. 3:20-cv-00044, Dkt. 171 (W.D. Va.).

322. Tolling is warranted until this time because, as the court found in *Fitzgerald*, the form loan contracts purportedly waived the borrowers' state-law defenses to the usurious loans, thus falsely representing to Plaintiffs—all of whom are vulnerable consumers in need of low-dollar loans—into believing that the loans were lawful and could not be challenged under the usury statutes of their home states or as unlawful debts under RICO.

323. In addition, the doctrine of fraudulent concealment is provides a separate basis to "prevent[] a defendant from 'concealing a fraud, or . . . committing a fraud in a manner that it

[8] As explained below, the statute of limitations should be further tolled until August 2024 pursuant to the doctrine of fraudulent concealment.

concealed itself until' the defendant 'could plead the statute of limitations to protect it.'" *Edmonson v. Eagle Nat'l Bank*, 922 F.3d 535, 549 (4th Cir. 2019) (citation omitted).

324. This purpose of this doctrine is to "ensur[e] that wrongdoers are not permitted, or encouraged, to take advantage of the limitations period to commit secret illegal conduct without penalty." *Id.*

325. To toll the limitations period based on fraudulent concealment, "a plaintiff must demonstrate: "(1) the party pleading the statute of limitations fraudulently concealed facts that are the basis of the plaintiff's claim, and (2) the plaintiff failed to discover those facts within the statutory period, despite (3) the exercise of due diligence." *Id.* (citation omitted).

326. In this case, each condition is satisfied.

327. First, as explained above, Defendants fraudulently concealed their involvement in the lending scheme by using the tribal lending entities as fronts for their illegal lending activities.

328. In addition, document after document demonstrates that borrowers were misled into believing that they were doing business with a company owned and operated by a sovereign government. For example, the websites and loan documents for each of the LDF Lending Entities identified above who issued loans to Plaintiff all described the lending entities as companies wholly owned and operated by the LDF, when in fact non-tribal outsiders, including Defendants, provided the brains, money, and manpower for the Usurious Lending Enterprise.

329. The template loan contracts made similar misrepresentations designed to fraudulently conceal the role of Defendants. The template loan contracts also waived federal and state law for the purpose of inhibiting borrowers from filing any claims related to the loans, which may have uncovered the role of Defendants in the lending scheme.

330. Second, Plaintiffs failed to discover the facts regarding Defendants' involvement until August 2024.

331. And third, Plaintiffs exercised due diligence. Despite the fraudulent concealments and misrepresentations, Plaintiffs' counsel identified and sued some of the key participants in the scheme as early as July 24, 2020, when they filed *Fitzgerald*. This lawsuit placed Defendants on notice that, once identified, they would likely be sued for their involvement.

332. However, because the defendants in the *Fitzgerald* case filed and subsequently appealed the court's decision on their many motions to dismiss and to compel arbitration, Plaintiffs were unable to engage in discovery until 2024, which led to the identification of Defendants' roles in the Usurious Lending Enterprise.

333. In other words, Plaintiffs were not dilatory in their prosecution of the case against the Tribal Officials and Defendants' business partners.

334. This lawsuit also comes less than a month after the court's final approval of the class settlement in *Fitzgerald*, which directly notified Plaintiffs of the illegality of their loans and the potential to recover from Defendants and other wrongdoers involved in the lending scheme.

335. Because the identities of the Defendants had been fraudulently concealed through the structure and misrepresentations by Defendants or at Defendants' direction, Plaintiffs submit that the statute of limitations should be tolled until at least August 31, 2024.

336. At least one court in this District addressing similar allegations has found that such tolling is appropriate, and the same is true here. *See Blackburn v. A.C. Israel Enterprises*, No. 3:22-cv-146, 2023 WL 4710884, at *10-12 (E.D. Va. July 24, 2023) (Novak, J.) (finding that allegations that delay in discovery of the defendants' involvement and fraudulent concealment in similar tribal lending enterprise supported tolling at least at the motion to dismiss stage).

**<u>COUNT ONE</u>:**
**VIOLATIONS OF RICO, 18 U.S.C. § 1962(d)**
**(CLASS CLAIM AGAINST ALL DEFENDANTS)**

337. Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

338. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class—the "Usurious Enterprise Class"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with any of the LDF Lending Entities[9]; (2) from Virginia, Indiana, Wisconsin, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Virginia, Washington, West Virginia, or Wyoming; and (3) repaid more than the principal balance of the loan.

Plaintiffs are members of this class.

339. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs Bradby, Webb, DiGiorgio, Hicks, Shores, Rowland, Barragan, Savaski, Ray, Eland, Ciotti, Brown, Lawson, Lewis, Melson, and Dipino bring this action for themselves and the following subclass—the "Bridge Lending Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with Bridge Lending; (2) from Virginia, Indiana, Wisconsin, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii,

---

[9] As used in this Complaint, the LDF Lending Entities are L.D.F. Business Development Corporation, LDF Holdings, LLC, Niiwin d/b/a Lendgreen, Niswi d/b/a LendUMo, Ziibi d/b/a Zfunds, Makwa d/b/a Makwa Financial, Niizh d/b/a Brightstar Cash, Midaaswi d/b/a National Small Loan, Naanan d/b/a Bear Claw Lending and Stone Lake Lending, Ningodwaaswi d/b/a Sky Trail Cash, Niizhwaaswi d/b/a Loan at Last, Zhaangaswi d/b/a Nine Torches, Biboon d/b/a Bridge Lending Solutions, Giizis d/b/a Lakeshore Loans, Nigig d/b/a UbiCash, Niibin d/b/a Cash Aisle, Mitig d/b/a MitigCapital, Anong d/b/a Avail Blue, Opichi d/b/a Evergreen Services, Zagime d/b/a Blue River Lending, Waawaatesi d/b/a Quick Help Loans (Greenline), and Ishwaaswi d/b/a Radiant Cash.

Idaho, Illinois, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Virginia, Washington, West Virginia, or Wyoming, and (3) repaid more than the principal balance of the loans.

Plaintiffs Bradby, Webb, DiGiorgio, Hicks, Shores, Rowland, Barragan, Savaski, Ray, Eland, Ciotti, Brown, Lawson, Lewis, Melson, and Dipino are members of this subclass.

340. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs DiGiorgio, Hicks, Barragan, Ray, Eland, and Lewis bring this action for themselves and the following subclass—the "Evergreen Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with Evergreen Services; (2) from Virginia, Indiana, Wisconsin, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Virginia, Washington, West Virginia, or Wyoming, and (3) repaid more than the principal balance of the loans.

Plaintiffs DiGiorgio, Hicks, Barragan, Ray, Eland, and Lewis are members of this subclass.

341. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs Hicks, Matthews, Dipino, and Robinson bring this action for themselves and the following subclass—the "Lendgreen Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with Lendgreen; (2) from Virginia, Indiana, Wisconsin, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Virginia, Washington, West Virginia, or Wyoming, and (3) repaid more than the principal balance of the loans.

Plaintiffs Hicks, Matthews, Dipino, and Robinson are members of this subclass.

342. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs Simpson, Thomas, and Lewis bring this action for themselves and the following subclass—the "Avail Blue Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with Avail Blue; (2) from Virginia, Indiana, Wisconsin, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Virginia, Washington, West Virginia, or Wyoming, and (3) repaid more than the principal balance of the loans.

Plaintiffs Simpson, Thomas, and Lewis are members of this subclass.

343. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs Webb, Reagan, and Eland bring this action for themselves and the following subclass—the "National Small Loan Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with National Small Loan; (2) from Virginia, Indiana, Wisconsin, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Virginia, Washington, West Virginia, or Wyoming, and (3) repaid more than the principal balance of the loans.

Plaintiffs Webb, Reagan, and Eland are members of this subclass.

344. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Waller brings this action for himself and the following subclass—the "Radiant Cash Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with Radiant Cash; (2) from Virginia, Indiana, Wisconsin, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New

> Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Virginia, Washington, West Virginia, or Wyoming, and (3) repaid more than the principal balance of the loans.

Plaintiff Waller is a member of this subclass.

345. **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. Indeed, the identified class members in the related *Fitzgerald* litigation included over 1 million individuals. The names and addresses of the class members are identifiable through the internal business records maintained by the LDF Lending Entities and Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

346. **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions include: (1) whether the interest rates used on loans violate each state's usury laws; (2) whether the choice-of-law provision used in their loan agreements and selecting the tribal law are enforceable; (3) whether the relationship between the various participants constitutes an enterprise as defined under RICO; (4) whether Defendants knew of and facilitated the conspiracy to collect the loans; and (5) whether the amounts paid by each consumer are recoverable against Defendants. These questions predominate over the questions affecting only individual class members.

347. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

348. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic

to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them to not vigorously pursue this action.

349. As alleged above, Defendants are an association-in-fact enterprise who are associated together for the common purpose of making, collecting, and profiting off the illegal loans, referred to herein as the "Usurious Lending Enterprise."

350. Specifically, each of the Defendants engaged in a lending enterprise with a single, unifying purpose—the issuance of usurious payday loans to consumers that attempted to evade state usury laws using the guise of the LDF's tribal sovereignty. They accomplished this purpose through the use of uniform servicing and loan agreements under which Defendants required the LDF to cede all material control over the LDF Lending Entities to Defendants in return for the funding and operational support that Defendants provided through their own officers, investors, and employees.

351. The LDF established these enterprises under a common scheme to establish multiple lending fronts that would allow the Tribe to generate revenue while permitting nontribal coconspirators, including Defendants, to share in the revenue generated from the lending entities.

352. Defendants participated in and coordinated their efforts behind this common scheme, including, upon information and belief, through the sharing of resources among the lending entities, including technical, underwriting, and operational support; the sharing of funding; and the sharing of marketing efforts, including through the joint and/or shared purchase of

borrower "leads" from credit reporting agencies and subsequent targeting of mailing and other advertising to those individuals.

353. Defendants also jointly benefitted from each other's involvement in the enterprise by sharing the risks of such an obviously illegal enterprise among multiple entities and individuals, who could jointly front the costs of such risks, including any legal judgment.

354. The shared objective, resources, and operations of the Usurious Lending Enterprise is further confirmed by the fact that Plaintiffs obtained loans from multiple such entities all operating under the guise of the LDF's sovereignty, which evidences the joint marketing efforts and lead-sharing that occurred between the various lending entities.

355. Alternatively, Bridge Lending, Evergreen Services, Avail Blue, Lendgreen, National Small Loan, and Radiant were each an enterprise as defined in 18 U.S.C. § 1961(4), and Defendants each participated and conspired to participate in the operations of their respective lending fronts.

356. Specifically, as outlined in Paragraphs 172-195, at a minimum, Defendants Dan Koetting, Perez, GDA Consulting, BCM, Envision Management, KP Investment Group, and the Tribe formed an association-in-fact that controls, directs, funds, underwrites, and operates the usurious lending operations of Bridge Lending and Evergreen Services (the "Bridge Lending Enterprise" and "Evergreen Enterprise," respectively), rendering them liable to at least the Bridge Lending and Enterprise Subclasses defined above.

357. Likewise, as outlined in Paragraphs 196-212, at a minimum, Defendants Mark Koettting, Myrick, MRC Consulting, PG2, and the Tribe formed an association-in-fact that controls, directs, funds, underwrites, and operates the usurious lending operations of Avail Blue

(the "Avail Blue Enterprise"), rendering them liable to at least the Avail Blue Subclass defined above.

358. As outlined in Paragraphs 213-238, at a minimum, Defendants 4finance, Vivus, Bettiol, Walker, and the Tribe formed an association-in-fact that controls, directs, funds, underwrites, and operates the usurious lending operations of Lendgreen (the "Lendgreen Enterprise"), rendering them liable to at least the Lendgreen Subclass defined above.

359. As outlined in Paragraphs 239-269, at a minimum, Defendants MoneyLion, Correia, Choubey, Salt Lake Capital, HarrowGate, and the Tribe formed an association-in-fact that controls, directs, funds, underwrites, and operates the usurious lending operations of Radiant (the "Radiant Cash Enterprise"), rendering them liable to at least the Radiant Cash Subclass defined above.

360. And as outlined in Paragraphs 270-284, at a minimum, Defendants Diaz, Rodriguez, Unified Analytics, National Techmark, and the Tribe formed an association-in-fact that controls, directs, funds, underwrites, and operates the usurious lending operations of National Small Loan (the "National Small Loan Enterprise"), rendering them liable to at least the National Small Loan Subclass defined above.

361. All of the loans made to Virginia, Indiana, Wisconsin, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Virginia, Washington, West Virginia, or Wyoming

included an interest rate far in excess of twice the enforceable rate under each consumer's respective state law.

362. Defendants violated § 1962(d) of RICO by agreeing to undertake and advance the Usurious Lending Enterprise and/or the other enterprises defined above, including by aiding, abetting, and facilitating the scheme through their funding of the loans, as well as through their ownership and oversight of the entities that funded and operated the loans issued to Plaintiffs. Defendants further violated § 1962(d) by aiding, abetting, and facilitating the scheme through their role in the creation of the original agreements related to the origination, funding, and servicing of the loans, as well as the merger agreements designed to shield the non-tribal outsiders from liability and facilitate the continued illegal lending activities.

363. Accordingly, Defendants are jointly and severally liable to Plaintiffs and the putative class members for their actual damages, treble damages, costs, and attorney's fees pursuant to 18 U.S.C. § 1964(c).

**<u>COUNT TWO</u>:**
**VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)**
**(CLASS CLAIM AGAINST ALL DEFENDANTS)**

364. Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

365. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of the classes and subclasses defined in Count One.

366. **<u>Numerosity</u>. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. Indeed, the identified class members in the related *Fitzgerald* litigation included over 1 million individuals. The names and addresses of the class members are identifiable through the internal business

records maintained by the LDF Lending Entities and Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

367. **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions include: (1) whether the interest rates used on loans violate each state's usury laws; (2) whether the choice-of-law provision used in their loan agreements and selecting the tribal law are enforceable; (3) whether the relationship between the various participants constitutes an enterprise as defined under RICO; (4) whether Defendants knew of and facilitate the conspiracy to collect the loans; and (5) whether the amounts paid by each consumer are recoverable against Defendants. These questions predominate over the questions affecting only individual class members.

368. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

369. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them to not vigorously pursue this action.

370. As alleged above, Defendants are an association-in-fact enterprise (the Usurious Lending Enterprise) who are associated together for the common purpose of making, collecting,

and profiting off the illegal loans. Alternatively, the Bridge Lending, Evergreen, Avail Blue, Lendgreen, National Small Loan, and Radiant Cash Enterprises defined above were each an enterprise as defined in 18 U.S.C. § 1961(4), rendering Defendants liable to the respective subclasses as outlined in Paragraphs 356-360.

371. All of the loans made to Virginia, Indiana, Wisconsin, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Washington, West Virginia, or Wyoming included an interest rate far in excess of twice the enforceable rate under each consumer's respective state law.

372. As alleged above, Defendants participated in the operation of the enterprise, which existed for the purpose of collection of unlawful debt. Among other things and as detailed above, Defendants helped design, implement and fund the tribal lending scheme through their ownership and control of the entities behind the lending operation, which developed the tribal lending scheme at the heart of this case.

373. Plaintiffs and the class members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(c) because the loans would not have been made but for Defendants' participation in the enterprise.

374. As a result of Defendants' violations, Defendants are jointly and severally liable to Plaintiffs and the putative class members for their actual damages, treble damages, costs, and attorney's fees pursuant to 18 U.S.C. § 1964(c).

**<u>COUNT THREE</u>:**
**UNJUST ENRICHMENT**
**(CLASS CLAIM AGAINST ALL DEFENDANTS)**

375. Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

376. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class—the "Unjust Enrichment Class"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with any of the LDF Lending Entities; (2) from Virginia, Indiana, Wisconsin, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Virginia, Washington, West Virginia, or Wyoming; and (3) repaid more than the principal balance of the loans.

Plaintiffs are members of the Unjust Enrichment Class.

377. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Bradby brings this action for himself and the following subclass—the "Virginia Unjust Enrichment Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with any of the LDF Lending Entities; (2) from Virginia, and (3) repaid more than the principal balance of the loans.

Plaintiff Bradby is a member of this subclass.

378. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Webb brings this action for herself and the following subclass—the "North Carolina Unjust Enrichment Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with any of the LDF Lending Entities; (2) from North Carolina, and (3) repaid more than the principal balance of the loans.

Plaintiff Webb is a member of this subclass.

379. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs DiGiorgio, Reagan, and Lawson bring this action for themselves and the following subclass—the "Florida Unjust Enrichment Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with any of the LDF Lending Entities; (2) from Florida, and (3) repaid more than the principal balance of the loans.

Plaintiffs DiGiorgio, Reagan, and Lawson are members of this subclass.

380. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs Hicks, Shores, Barragan, Simpson, Rowland, and Brown bring this action for themselves and the following subclass—the "California Unjust Enrichment Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with any of the LDF Lending Entities; (2) from California, and (3) repaid more than the principal balance of the loans.

Plaintiffs Hicks, Shores, Barragan, Simpson, Rowland, and Brown are members of this subclass.

381. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs Thomas, Eland, Ray, and Melson bring this action for themselves and the following subclass—the "Michigan Unjust Enrichment Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with any of the LDF Lending Entities; (2) from Michigan, and (3) repaid more than the principal balance of the loans.

Plaintiffs Thomas, Eland, Ray, and Melson are members of this subclass.

382. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Savaski brings this action for himself and the following subclass—the "Mississippi Unjust Enrichment Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with any of the LDF Lending Entities; (2) from Mississippi, and (3) repaid more than the principal balance of the loans.

Plaintiff Savaski is a member of this subclass.

383. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Ciotti brings this action for himself and the following subclass—the "Maryland Unjust Enrichment Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with any of the LDF Lending Entities; (2) from Maryland, and (3) repaid more than the principal balance of the loans.

Plaintiff Ciotti is a member of this subclass.

384. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs Smith and Howell bring this action for themselves and the following subclass—the "Missouri Unjust Enrichment Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with any of the LDF Lending Entities; (2) from Missouri, and (3) repaid more than the principal balance of the loans.

Plaintiffs Smith and Howell are members of this subclass.

385. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Dipino brings this action for herself and the following subclass—the "Washington Unjust Enrichment Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with any of the LDF Lending Entities; (2) from Washington, and (3) repaid more than the principal balance of the loans.

Plaintiff Dipino is a member of this subclass.

386. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Waller brings this action for himself and the following subclass—the "Pennsylvania Unjust Enrichment Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with any of the LDF Lending Entities; (2) from Pennsylvania, and (3) repaid more than the principal balance of the loans.

Plaintiff Waller is a member of this subclass.

387. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Lewis brings this action for herself and the following subclass—the "Arizona Unjust Enrichment Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with any of the LDF Lending Entities; (2) from Arizona, and (3) repaid more than the principal balance of the loans.

Plaintiff Lewis is a member of this subclass.

388. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Matthews brings this action for herself and the following subclass—the "Texas Unjust Enrichment Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with any of the LDF Lending Entities; (2) from Texas, and (3) repaid more than the principal balance of the loans.

Plaintiff Matthews is a member of this subclass.

389. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Robinson brings this action for herself and the following subclass—the "Illinois Unjust Enrichment Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with any of the LDF Lending Entities; (2) from Illinois, and (3) repaid more than the principal balance of the loans.

Plaintiff Robinson is a member of this subclass.

390. **<u>Numerosity</u>. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. Indeed, the identified class members in the related *Fitzgerald* litigation included over 1 million individuals.

The names and addresses of the class members are identifiable through the internal business records maintained by the LDF Lending Entities and Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

391. **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions include: (1) whether the interest rates used on loans violate each state's usury laws; (2) whether the choice-of-law provision used in their loan agreements and selecting the tribal law are enforceable; (3) whether Plaintiffs and the class members conferred a benefit on Defendants; (4) whether Defendants knew or should have known of the benefit; (5) whether Defendants retained an unjust benefit because the loan was void; and (6) what is the proper recovery for Plaintiffs and the class members against each of Defendants.

392. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

393. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them to not vigorously pursue this action.

394. As detailed above, all loans to Virginia, Indiana, Wisconsin, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Virginia, Washington, West Virginia, or Wyoming were unenforceable.

395. Plaintiffs and the class members conferred a benefit on Defendants when they repaid the void loans; Defendants knew or should have known of the benefits; and Defendants have been unjustly enriched through their receipt of any amounts in connection with the unlawful loans.

396. Accordingly, on behalf of themselves and the class defined above, Plaintiffs seek to recover from Defendants, jointly and severally, all amounts repaid on any loans with the LDF Lending Entities.

**COUNT FOUR:**
**COMMON LAW CONSPIRACY**
**(CLASS CLAIM AGAINST ALL DEFENDANTS)**

397. Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

398. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class—the "Civil Conspiracy Class"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with any of the LDF Lending Entities; (2) from Virginia, Indiana, Wisconsin, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Kansas, Kentucky, Louisiana, Maine,

> Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Virginia, Washington, West Virginia, or Wyoming; and (3) repaid more than the principal balance of the loans.

Plaintiffs are members of the Civil Conspiracy Class.

399. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Bradby brings this action for himself and the following subclass—the "Virginia Civil Conspiracy Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with any of the LDF Lending Entities; (2) from Virginia, and (3) repaid more than the principal balance of the loans.

Plaintiff Bradby is a member of this subclass.

400. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Webb brings this action for herself and the following subclass—the "North Carolina Civil Conspiracy Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with any of the LDF Lending Entities; (2) from North Carolina, and (3) repaid more than the principal balance of the loans.

Plaintiff Webb is a member of this subclass.

401. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs DiGiorgio, Reagan, and Lawson bring this action for themselves and the following subclass—the "Florida Civil Conspiracy Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with any of the LDF Lending Entities; (2) from Florida, and (3) repaid more than the principal balance of the loans.

Plaintiffs DiGiorgio, Reagan, and Lawson are members of this subclass.

402. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs Hicks, Shores, Barragan, Simpson, Rowland, and Brown bring this action for themselves and the following subclass—the "California Civil Conspiracy Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with any of the LDF Lending Entities; (2) from California, and (3) repaid more than the principal balance of the loans.

Plaintiffs Hicks, Shores, Barragan, Simpson, Rowland, and Brown are members of this subclass.

403. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs Thomas, Eland, Ray, and Melson bring this action for themselves and the following subclass—the "Michigan Civil Conspiracy Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with any of the LDF Lending Entities; (2) from Michigan, and (3) repaid more than the principal balance of the loans.

Plaintiffs Thomas, Eland, Ray, and Melson are members of this subclass.

404. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Savaski brings this action for himself and the following subclass—the "Mississippi Civil Conspiracy Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with any of the LDF Lending Entities; (2) from Mississippi, and (3) repaid more than the principal balance of the loans.

Plaintiff Savaski is a member of this subclass.

405. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Ciotti brings this action for himself and the following subclass—the "Maryland Civil Conspiracy Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with any of the LDF Lending Entities; (2) from Maryland, and (3) repaid more than the principal balance of the loans.

Plaintiff Ciotti is a member of this subclass.

406. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs Smith and Howell bring this action for themselves and the following subclass—the "Missouri Civil Conspiracy Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with any of the LDF Lending Entities; (2) from Missouri, and (3) repaid more than the principal balance of the loans.

Plaintiffs Smith and Howell are members of this subclass.

407. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Dipino brings this action for herself and the following subclass—the "Washington Civil Conspiracy Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with any of the LDF Lending Entities; (2) from Washington, and (3) repaid more than the principal balance of the loans.

Plaintiff Dipino is a member of this subclass.

408. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Waller brings this action for himself and the following subclass—the "Pennsylvania Civil Conspiracy Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with any of the LDF Lending Entities; (2) from Pennsylvania, and (3) repaid more than the principal balance of the loans.

Plaintiff Waller is a member of this subclass.

409. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Lewis brings this action for herself and the following subclass—the "Arizona Civil Conspiracy Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with any of the LDF Lending Entities; (2) from Arizona, and (3) repaid more than the principal balance of the loans.

Plaintiff Lewis is a member of this subclass.

410. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Matthews brings this action for herself and the following subclass—the "Texas Civil Conspiracy Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with any of the LDF Lending Entities; (2) from Texas, and (3) repaid more than the principal balance of the loans.

Plaintiff Matthews is a member of this subclass.

411. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Robinson brings this action for herself and the following subclass—the "Illinois Civil Conspiracy Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with any of the LDF Lending Entities; (2) from Illinois, and (3) repaid more than the principal balance of the loans.

Plaintiff Robinson is a member of this subclass.

412. **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. Indeed, the identified class members in the related *Fitzgerald* litigation included over 1 million individuals. The names and addresses of the class members are identifiable through the internal business records maintained by the LDF Lending Entities and Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

413. **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions include: (1) whether the interest rates used on loans violate each state's usury laws; (2) whether the choice-of-law provision used in their loan agreements and selecting the tribal law are enforceable;

(3) whether Defendants combined together or with others to accomplish an unlawful purpose; (4) whether at least one member of the conspiracy committed an unlawful act; (5) whether collection of a usurious and unenforceable loan caused injuries to Plaintiffs and the class members; and (6) what is the proper recovery for Plaintiffs and the class members against each of Defendants.

414. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

415. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them to not vigorously pursue this action.

416. As detailed above, all loans to Virginia, Indiana, Wisconsin, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Virginia, Washington, West Virginia, or Wyoming were unenforceable.

417. As alleged above, Defendants violated state common law conspiracy prohibitions by joining together through a series of agreements to accomplish the making, collection, and

profiting from the blatantly illegal usurious loans. Among others, these agreements include the original agreements related to the origination, funding, and servicing of the loans, as well as the merger agreements designed to shield the non-tribal outsiders from liability and facilitate the continued illegal lending activities through the promissory notes and related documents.

418. Plaintiffs and the class members were injured as a result of Defendants' violations because they repaid amounts arising from the unlawful conspiracy.

419. As a result of Defendants' violations, Defendants are jointly and severally liable to Plaintiffs and the putative class members for their actual damages, treble damages, costs, and attorney's fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment against Defendants as follows:

A. An Order certifying the proposed Classes under Fed. R. Civ. P. 23 (b)(3) and appointing Plaintiffs as class representatives and their counsel as class counsel, as soon as practicable;

B. An Order declaring that Defendants are financially responsible for notifying class members of the pendency of this suit;

C. An Order declaring that Defendants committed the violations of law alleged herein;

D. An Order providing for any and all injunctive relief the Court deems appropriate;

E. An Order awarding monetary damages, including but not limited to any compensatory, incidental, or consequential damages in an amount to be determined by the Court or jury;

F. An Order awarding treble damages in accordance with proof and in an amount

consistent with applicable precedent;

G. An Order awarding interest at the maximum allowable legal rate on the foregoing sums;

H. An Order awarding Plaintiffs their reasonable costs and expenses of suit, including attorneys' fees; and

I. Such further relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury.

Respectfully submitted,
**PLAINTIFFS,** *individually and on behalf of all others similarly situated*

By: */s/ Kristi C. Kelly*
Kristi Cahoon Kelly, VSB #72791
Andrew J. Guzzo, VSB #82170
Casey S. Nash, VSB #84261
Patrick McNichol, VSB No. 92699
Matthew G. Rosendahl, VSB No. 93738
**KELLY GUZZO PLC**
3925 Chain Bridge Road, Suite 202
Fairfax, Virginia 22030
Telephone: (703) 424-7572
Facsimile: (703) 591-0167
Email: kkelly@kellyguzzo.com
Email: aguzzo@kellyguzzo.com
Email: casey@kellyguzzo.com
Email: pat@kellyguzzo.com
Email: matt@kellyguzzo.com

*Counsel for Plaintiffs*